IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Robert Levin, and Mary Self, Mother of Robert Levin, | C/A No. 3:12-cv-0007-JFA |
| Plaintiffs, | |
| vs. | **ORDER** |
| South Carolina Department of Health and Human Services, | |
| Defendant. | |

## I.    INTRODUCTION

This case arises out of the reduction in benefits provided to a Medicaid-eligible individual and seeks to challenge the policies and procedures in the operation of the Head and Spinal Cord Injury ("HASCI") Medicaid waiver program.  In the Second Amended Complaint, Robert Levin ("Levin"), and Mary Self ("Self"), Mother of Robert Levin (collectively "Plaintiffs") allege violations of the Americans with Disabilities Act, violations of Section 504 of the Rehabilitation Act, and violations of 42 U.S.C. §§ 1983 and 1985 (Civil Rights) against the South Carolina Department of Health and Human Services ("SDHHS").[1] (ECF No. 72).

Plaintiffs initially demanded a jury trial for their claims; however, upon motion of SCDHHS, the Court struck the jury demand because Plaintiffs' requested relief is equitable in

---

[1] Plaintiffs also alleged violations of (1) statutory and constitutional due process, (2) the S.C. Administrative Procedures Act, and (3) the Medicaid Act. The Court granted summary judgment in favor of SCDHHS on these causes of action. (ECF No. 131).

nature. (ECF No. 147).  Pursuant to a pretrial conference conducted with the parties on February 18, 2015, the Court elected to bifurcate the trial of this matter, splitting the case into two phases. As set forth in detail in the Court's Pretrial Order, Phase I of the trial would only focus on the threshold issue of whether Levin is at significant risk of institutionalization.  (ECF No. 171). Only after a determination that Plaintiffs had met their burden on this issue would the Court proceed to Phase II, which would encompass the issue of SCDHHS' defense of fundamental alteration.  However, if Plaintiffs failed to meet their burden on the threshold issue, the case would end at that point.  (Id.).

In accordance with the Pretrial Order, the Court held a bench trial on Phase I on Tuesday, February 24, 2015, and Wednesday, February 25, 2015.  At the close of evidence, Defendant made three motions: (1) Motion to Amend Answer to Assert Affirmative Defense of Statute of Limitations, (2) Motion to Strike, and (3) Motion for Judgment as a Matter of Law.  The Court heard oral argument on these motions and took them all under advisement.  This written order sets forth the Court's rulings on those pending motions. Further, in accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure, this order is also being issued to detail the Court's findings of facts and conclusions of law on the evidence presented in Phase I.

## II.    STATUTORY FRAMEWORK

### A.  Medicaid Waiver Program

Medicaid is a joint federal and state program enacted to provide medical care to needy individuals.  While the costs of the program are allocated between the federal and state governments, the federal government provides more funds for operation of the program. Pursuant to Medicaid regulations, states may obtain a waiver of certain statutorily-defined Medicaid requirements in order to offer "an array of home and community-based services that an

individual needs to avoid institutionalization." 42 C.F.R. § 441.300. In South Carolina, SCDHHS is the single agency that administers Medicaid. SCDHHS contracts with the South Carolina Department of Disabilities and Special Needs to administer the day-to-day operations of the waiver programs.

On January 1, 2010, the five (5) year renewal of the waivers, as approved by the Centers for Medicare and Medicaid Services went into effect. The renewed waivers included a cap or limit on some services and completely excluded others. These limits and exclusions form the basis of Plaintiffs' lawsuit.

### III.    FINDINGS OF FACT

Based upon the testimony adduced at the bench trial held on February 24, 2015, and February 25, 2015, the Court makes the following findings of fact.

#### A. Robert Levin

1. Levin is a Medicaid-eligible disabled adult who has been receiving services under the HASCI waiver program. In 2001, Levin sustained a massive head injury when he fell off a moving truck while attempting to take pictures of Ground Zero in the days following the 9/11 terrorist attacks. Levin suffered a brain stem bleed on the right side of his head, requiring removal of a portion of his brain. He initially spent several months in the hospital obtaining treatment and undergoing several surgeries. Ultimately, the traumatic nature of the injury rendered Levin a wheelchair-bound quadriplegic.

2. For the first four years after Levin's accident, he resided in a nursing home facility approximately 150 miles roundtrip from his mother's home. After daily visits to the nursing home to assist in the care of her son, Self elected to remove Levin from the facility and provide care for him at home. Prior to the 2010 waiver caps, Levin received

3

56 hours of Attendant Care/Personal Services per week. However, effective January 1, 2010, Levin's Attendant Care/Personal Services were reduced to 49 hours per week.  In addition to these services, Levin is also authorized for 30 hours per year of back up emergency attendant care for use through an agency, should one of his attendants not be available to provide his regularly scheduled care, and he also receives incontinence supplies through both the Medicaid Sate Plan and the HASCI waiver program.

3. Levin's daily ritual of care is lengthy and time consuming.  Levin is not totally paralyzed, as he has some limited movement in his limbs; however, he requires assistance with all of his activities of daily living, including toileting, eating, and dressing.  Due to the nature of Levin's injury, he is unable to speak and merely expresses pain, discomfort, or agitation by grinding his teeth or crying out. His caregivers conduct range of motion exercises in order to prevent limb cramping and spasticity, which helps Levin maintain a more normal posture.

### B. Witness Testimony

4. Plaintiffs presented three witnesses to testify on the issue before the Court in Phase I: Charles G. Shissias, M.D., Jarrett Crandall, and Self.  Plaintiffs' first witness was Dr. Shissias, a neurologist with the Beaufort Memorial Lowcountry Medical Group in Beaufort, South Carolina. Dr. Shissias has been treating Levin for the past ten years and renders care to Levin exclusively for the spasticity issues in his limbs.  Dr. Shissias sees Levin approximately every ninety days, but he is not Levin's general primary physician. Under Dr. Shissias' care, Levin is prescribed medication to alleviate pain and to improve the elasticity of his limbs, and Dr. Shissias also gives Levin Botox injections to calm his overactive limbs that spontaneously move.  Dr. Shissias testified at length about Levin's

daily needs, which are provided by Self and his other caretakers.  This daily routine was described as a ritual of care.[2]  He pointed out that the excellent care provided to Levin by Self is evident in Levin's overall appearance and lack of any major complications or problems.   Dr. Shissias also spent significant time discussing the lack of adequate comparable care that could be provided to Levin if he was institutionalized.  Specifically, Dr. Shissias indicated that Levin would most likely "fall through the cracks" in such a facility, given the ratio of patients to caregivers in such a setting.  Further, he testified that Levin would also be at an increased risk of developing decubitus ulcers because he spends a great deal of time seated in a wheelchair.

5.  In terms of Levin's attendant care service provided through HASCI, Dr. Shissias was not aware of how many hours Levin was entitled to per week.  He indicated that it was his recommendation that Levin receive 60 hours of attendant care per week, but he could not remember when he signed an order requesting that level of care.  Dr. Shissias was also not familiar with the services SCDHHS currently provides to Levin or that any of his services had been reduced.

6.  Plaintiffs' also called Jarod Crandell, Levin's attendant nurse, as a witness.  Mr. Crandell is employed by Care Pro Home Health Services, and he spends a significant amount of time caring for Levin on an almost daily basis.  Mr. Crandell expounded on the many tasks he performs for Levin, including changing, bathing, dressing, and exercising.  He spoke in great detail about Levin's ritual of care. Mr. Crandell testified that in his opinion Levin would most likely not fare well in a nursing home-type facility due to his many

---

[2] Dr. Shissias also testified to his lack of personal knowledge regarding this ritual, as its details were given to him by Plaintiffs' counsel in preparation for trial.

limitations and inability to control his movements, which might present a danger to others.

7. Plaintiffs' last witness was Self, Levin's mother.  Self described the tragic accident that rendered Levin a quadriplegic.  She also explained the extent of Levin's injuries, the initial surgeries he underwent right after his accident, and the difficulty she had finding a South Carolina nursing home that would initially care for Levin.  Self also explained Levin's daily ritual of care and the toll his condition and continuous need for care has taken on her. Self testified that she requested SCDHHS provide additional nursing hours for Levin in 2014, as written in Dr. Shissias' physician order. However, Self admitted that she had not complied with all the requirements set forth by SCDHHS in order to receive the extra nursing hours.  When SCDHHS provided Self with medical releases, she refused to sign the releases, stating that she wanted to speak with her attorney first.  As of the date of the bench trial, Self testified she still had not executed the medical releases as requested by SCDHHS.

8. SCDHHS called two witnesses during Phase I of trial.  SCDHHS' first witness was Linda Veldeer, head of the HSACI waiver program.  Ms. Veldeer explained that the process for review of any requested services under the program.  Significantly, she indicated that a review of any request for services cannot be performed unless and until all proper forms are received by the department.  Upon receipt of all necessary documentation, a nurse reviews the request for services and makes a recommendation to Ms. Veldeer as head of the program.  This would be the process utilized for any request for services made by Self on Levin's behalf.  Ms. Veldeer did not have an opinion regarding whether Levin is at risk of institutionalization; however, she testified that every person in the waiver program

is at some risk of institutionalization by virtue of the fact that they need institutional-level care, but have elected to receive those services at home rather than in an institutional setting.  In this regard, the entire waiver program is an alternative program because it affords participants an alternative to institutionalization.

9. Carmen Hay, Levin's caseworker, also testified on behalf of SCDHHS. Ms. Hay meets with Levin and Self twice a year to review the adequacy of Levin's of plan of care. Based on Ms. Hay's observations, Levin's caretakers are attentive; Levin is well groomed and does not ever appear to be in pain or distress when Ms. Hay visits.  Prior to 2010, Levin received 8 hours of nursing care per day, totaling 56 hours per week.  Beginning in 2010, Levin's nursing hours were reduced to 7 hours per day, totaling 49 hours per week. Based on Ms. Hay's records, the first time Self requested additional nursing hours for Levin was on October 23, 2014.  Ms. Hay explained that in order to approve such a request, SCDHHS would have to obtain the participant's medical records, as well as the doctor's order for the additional hours.  However, the doctors' offices will not produce a participant's medical records without an executed release, so SCDHHS is required to obtain signed releases from the responsible caretaker.  To date, Self has not provided SCDHHS with the necessary releases required to procure Levin's medical records.  Ms. Hay does not believe that Levin is at a serious risk of institutionalization, and to her knowledge Self has never expressed concern that Levin would be at serious risk if he did not receive additional services.

### C. *Plaintiffs' Claims*

10. There are three remaining causes of action currently before the Court: (1) Third Cause of Action for violation of the Americans with Disabilities Act ("ADA"), (2) Fourth Cause of

Action for violation of § 504 of the Rehabilitation Act, and (3) Sixth Cause of Action for violation of 42 U.S.C. §§ 1983 and 1988.  However, based on stipulation of the parties, only Plaintiffs' claims under the ADA and § 504 of the Rehabilitation Act were before the Court during the bench trial.

11. Plaintiffs' third cause of action for violation of the ADA alleges that SCDHHS failed to make reasonable modifications to the home and community-based waiver programs to allow Levin to stay in his integrated home-based setting, which constitutes unlawful discrimination.   Similarly, Plaintiffs' fourth cause of action for violation of § 504 of the Rehabilitation Act alleges that SCDHHS has failed to make reasonable modifications to home and community-based waiver programs to allow Levin to utilize waiver services so he can successfully maintain his placement in the least restrictive setting appropriate to his needs, which constitutes unlawful segregation.

## IV.    CONCLUSIONS OF LAW

In order to determine what evidence and issues are properly before the Court, it is necessary to first address the Motion to Amend the Pleadings and Motion to Strike made by SCDHHS at the end of Phase I.

### A.  SCDHHS' Motion to Amend the Pleadings

At the close of Plaintiffs' presentation of evidence, SCDHHS moved to amend its pleadings to assert the affirmative defense of statute of limitations based on evidence and argument presented by Plaintiffs during their case-in-chief.  Specifically, Plaintiffs sought to introduce evidence that the complained of actions taken by SCDHHS in this case began well before the 2010 waiver caps were implemented, and that the actions of SCDHHS constitute ongoing violations.  However, these allegations were not pled in the Complaint, and SCDHHS

requested permission to amend its pleading, to the extent the Court was inclined to allow such pre-2010 evidence. SCDHHS further argued that assuming a three-year statute of limitations for ADA and Rehabilitation Act claims, Plaintiffs should only be allowed to present evidence dating back to 2009 because this action was filed in 2012.[3]

A review of the applicable statute of limitations is necessary in order to determine what evidence is properly before the Court. At the outset, the Court notes that neither Title II of the ADA nor the Rehabilitation Act expressly proscribes a statute of limitations. Pursuant to 42 U.S.C. § 1234(a), the Attorney General is empowered to promulgate regulations to effectuate the purposes of Title II of the ADA. In accordance with that authority, 28 C.F.R. § 35.170(b) requires that a complaint under Title II against a public entity be filed within one hundred and eighty (180) days of the alleged discriminatory act.

However, in considering the appropriate statue of limitations for these claims, the Fourth Circuit has held that courts should engage in the same substantive analysis for determining the limitations period for both the ADA and the Rehabilitation Act "[b]ecause the language of the two statutes is substantially the same." *Cockrell v. Lexington Cnty. Sch. Dist. One*, No. 3:11-CV-2042-CMC, 2011 WL 5554811, at *12 (D.S.C. Nov. 15, 2011) (citing *A Society Without a Name v. Virginia*, 655 F.3d 342 (4th Cir. 2011)). *See also*, *Levy v. Mote*, 104 F.Supp.2d 538, 543 (D.Md. 2000) (finding that the Rehabilitation Act imposes essentially the same requirements as the ADA); *Smaw v. Commonwealth of Virginia Dep't of State Police*, 862 F.Supp. 1469, 1474 (E.D.Va. 1994) ("By design the ADA standards mirror those of the Rehabilitation Act . . . The emergence of the ADA does not create a new avenue for claims in the area of disability

---

[3] SCDHHS argued that South Carolina's personal injury statute of limitations applies to Levin's claims, which would provide for a three year statute of limitations.

discrimination; rather, the ADA incorporates the existing language and standards of the Rehabilitation Act in this area.")

Therefore, the same limitations period may apply to both a claim under the ADA and a claim under the Rehabilitation Act. *Cockrell v. Lexington Cnty. Sch. Dist. One*, No. 3:11-CV-2042-CMC, 2011 WL 5554811, at *12 (D.S.C. Nov. 15, 2011) (concluding that "either a 180–day or one-year limitations period applies to Plaintiffs' ADA claim," but not deciding which is the applicable statute of limitations "because Plaintiffs' ADA claim fails under either a 180–day or one-year limitations period.")

In calculating the statute of limitations for a claim brought under the Rehabilitation Act, "the most appropriate or analogous statute of limitations derived from the state law most applicable to this federal statute is to be used." *Childers v. County of York South Carolina*, No. 0:06-897-CMC, 2008 WL 552879, at *10 (D.S.C., Feb. 26, 2008) (citing 42 U.S.C. § 1988(a); *Wilson v. Garcia*, 471 U.S. 261, 268 (1985)).  The most analogous South Carolina state law to the federal statute is the South Carolina Human Affairs Law, which was passed by the South Carolina Legislature to specifically address claims of discrimination, including discrimination based on disability.  S.C. Code Ann. § 1-13-10, *et. seq.*; *Childers* 2008 WL 552879, at *11, *Cf. Moore v. Greenwood School District No. 52*, 195 Fed.Appx. 140, 143 (4th Cir. 2006) (applying standards of the South Carolina Human Affairs Law to a case brought under Title IX); *Wolsky v. Medical College of Hampton Roads*, 1 F.3d. 222, 224 (4th Cir. 1993) (declining to apply state personal injury statute of limitations to the Rehabilitation Act and finding that one year statute of limitations provided by the Virginia Human Affairs Law was most analogous statute for claim brought under the Rehabilitation Act).  The South Carolina Human Affairs Law proscribes a one year statute of limitations for alleged violations.  S.C. Code Ann. § 1-13-90(d)(7) and (8), (e) and

(f). Accordingly, Levin's claims should have been brought within one year of SCDHHS' alleged violation. *A Society Without a Name,* 655 F.3d 342 (borrowing statute of limitations for an ADA claim from most analogous state law and applying a one-year limitations period to Rehabilitation Act and ADA claims).

In Plaintiffs' Second Amended Complaint, they assert that prior to 2010, the HASCI waiver program allowed for services, supplies, and equipment to be provided under the plan based on the medical necessity of each participant. However, in 2010, formal caps were instituted, which limited the amount of services each waiver participant could receive. (ECF No. 72, ¶ 46). Plaintiffs further allege that since January 1, 2010, Levin's services have been reduced and reimbursement rates to his providers and physicians have been systematically reduced as well. (Id. at ¶ 143). Based on the allegations contained in Plaintiffs' complaint, it is clear they knew or should have known they had a claim under the ADA and Rehabilitation Act on January 1, 2010, when the waiver caps went into effect.[4] In determining when the statute of limitations begins to run, South Carolina follows the discovery rule.

> According to the discovery rule, the statute of limitations begins to run when a cause of action reasonably ought to have been discovered. The statute runs from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct. The date on which discovery of the cause of action should have been made is an objective, rather than subjective, question. In other words, whether the particular plaintiff actually knew he had a claim is not the test. Rather, courts must decide whether the circumstances of the case would put a person of common knowledge and experience on notice that some right of his has been invaded, or that some claim against another party might exist.

---

[4] There was some testimony elicited by Plaintiffs' counsel during the bench trial that tended to suggest that Plaintiffs may have had notice of the proposed reductions some time in 2009, before January 1, 2010; however, the date of this prior knowledge was not clearly established, and the Court believes the effective date of the waiver caps is a more generous and appropriate start date for the running of Plaintiffs' statute of limitations.

*Bayle v. S. Carolina Dep't of Transp.*, 344 S.C. 115, 123, 542 S.E.2d 736, 740 (Ct. App. 2001) (internal quotation marks and citations omitted).

Therefore, Plaintiffs had one year from January 1, 2010, the date on which Levin's services were reduced, in which to bring their claims under the ADA and Rehabilitation Act. However, Plaintiffs did not file their complaint until January 1, 2012; one year after the statute of limitations had already run.  Accordingly, Plaintiffs' claims, as pled, fail under the statute of limitations, as would any allegations that predate January 1, 2010.[5]

During the trial of this case, Plaintiffs' counsel argued that SCDHHS has engaged in continuous violations of the ADA and Rehabilitation Act, such that evidence predating 2009 is properly before this Court.[6]  However, the argument advanced by counsel was vague and does not give this Court adequate information upon which to assess the viability of a continuing violation for pre-2009 actions of SCDHHS.  Additionally, even if SCDHHS committed violations prior to 2009, in order for the continuing violations theory to be applicable, a violation would still have to occur within the relevant statutory timeframe.[7]  Here, Plaintiffs did not file their complaint until 2012.  As such, in order to invoke the saving mechanism allowed for by the continuing violation theory, Plaintiffs would still be required to show that a violation occurred

---

[5] Plaintiffs' other remaining claim under 42 U.S.C. § 1983 also lacks an express limitations period. To determine the proper statute of limitations in a § 1983 claim, the United States Supreme Court has found that the federal court should adopt the forum state's statute of limitations for personal injury claims. *Wilson v. Garcia,* 471 U.S. 261, 276 (1985), *superseded by statute on other grounds as stated in Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369 (2004); *Nat'l Adver. Co. v. City of Raleigh,* 947 F.2d 1158, 1161 (4th Cir.1991) (stating that since "there is no federal statute of limitations applicable to suits under § 1983, it is the rule that the applicable [statute of limitations] must be borrowed from the analogous state statute of limitations") (internal citations omitted). Under South Carolina law, the statute of limitations for a personal injury claim is three years. S.C.Code Ann. § 15–3–530(5). Thus, "[t]he statute of limitations for section 1983 causes of action arising in South Carolina is three years." *Hamilton v. Middleton,* No. 4:02–1952–23, 2003 WL 23851098, at *4 (D.S.C. June 20, 2003); *see also Hoffman v. Tuten,* 446 F.Supp.2d 455, 459 (D.S.C. 2006). In light of this three year statute of limitations, Plaintiffs' claim under § 1983 is timely filed.

[6] This argument was made by counsel in response to SCDHHS' assertion that a three year statute of limitations applies to Plaintiffs' claims.
[7] *See Moseke v. Miller and Smith, Inc.*, 202 F.Supp.2d 492, 505 (E.D.Va. 2002) ("[A] discriminatory act must occur within the statute of limitations time frame to constitute a continuing violation.")

*every year* from 2011 back in order to demonstrate that the statute of limitations began running anew each year. Plaintiffs' general assertion that such violations occurred and reference to unspecified evidence in support of that contention is not enough to maintain a continuing violations theory.

Most importantly, such evidence does not appear to be relevant to the current issue before the Court, namely the propriety of the reduction of Levin's services as a result of the 2010 waiver caps, and whether such reductions place him at a serious risk of institutionalization. It appears the most appropriate application of Plaintiffs' continuing violation argument is to their claims from 2011 (one year after the waiver caps were instituted and when Plaintiff's statute of limitations had run) to 2012 (the date of filing of this action), which could potentially cure their untimely filed claims under the ADA and Rehabilitation Act.

The continuing violation theory was first articulated by the United States Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In that decision, the Court held that discriminatory incidents that occur beyond the limitations period are actionable "where a plaintiff . . . challenges not just one incident of [unlawful] conduct . . . but an unlawful practice that continues into the limitations period. [In such instances,] the complaint is timely when it is filed [within the statute of limitations period] of the last asserted occurrence of that practice." *Id.* at 380. Importantly, the plaintiffs' claims in *Havens* "were based not solely on isolated incidents . . . *but a continuing violation manifested in a number of incidents.*" *Moseke v. Miller and Smith, Inc.*, 202 F.Supp.2d 492, 505 (E.D. Va. 2002) (emphasis in original) (citing *Havens Realty Corp.*, at 381). Therefore, "where there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period." *Hathicock v. Frank*, 958 F.2d 671, 677-78 (6th Cir. 1992) (citing

13

*Hull v. Cuyahoga Valley Joint Vocational School Dist. Bd. of Educ.*, 926 F.2d 505, 511 (6th Cir.) *cert. denied.*, 501 U.S. 1261 (1991)); *Moseke,* 202 F.Supp.2d at 505 ("[A] discriminatory act must occur within the statute of limitations time frame to constitute a continuing violation").

However, the Supreme Court has acknowledged a distinction between continuing violations and continuing effects. While the former can extend the statute of limitations, the latter does not act to save an otherwise stale claim. "The Supreme Court has consistently held that a continuing violation was not present where there was a subsequent effect resulting from the defendant's prior discriminatory act. The emphasis should not be placed on mere continuity; the critical question is whether any present violation exists." *Moseke*, at 506 (citing *United Air Lines v. Evans*, 431 U.S. 553, 557 (1977)) (internal quotation marks omitted). Likewise, the continuing violation doctrine has been rejected by the Fourth Circuit in instances where the effect is continuing, but the defendant's act is not. *National Advertising Co. v. City of Raleigh*, 947 F.2d. 1158, 1166 (4th Cir. 1991) ("A continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation."); *Jersey Heights Neighborhood Assoc. v. Glendening*, 174 F.3d. 180 (4th Cir. 1999). Accordingly, "it is clear that the continuing effects of a previous discriminatory act do not constitute a continuing violation." *Moseke,* at 507.

Here, Plaintiffs' complaint alleges that SCDHHS acted unlawfully when it implemented a cap on the amount of services provided to participants under the HASCI waiver plan. While it appears to the Court this decision has possibly resulted in numerous ill effects to Plaintiffs, it still only constitutes one action. The waiver caps became effective January 1, 2010, and the Court has not been presented with any evidence to substantiate Plaintiffs' claim that additional violations

have occurred since that time.[8]  Admittedly, Plaintiffs have had to deal with the resulting effects of the reduction in services since 2010; however, such burdens on Plaintiffs are not tantamount to a continuing violation.  As such, the statute of limitations for Plaintiffs' claims is not tolled as a result of a continuing violation.

Therefore, the Court grants SCDHHS' motion to Amend Pleadings to allow for an assertion of the affirmative defense of statute of limitations.  In doing so, Plaintiffs' ADA and Rehabilitation claims are deemed untimely.[9]

### B.  SCDHHS' Motion to Strike

SCDHHS has also moved to strike evidence presented during trial related to any 2014 claims, specifically the physician's order for 60 hours of nursing care, on the ground of ripeness. SCDHHS argues this evidence should be stricken because this physician's order has not been pled as an issue in this litigation.  As stated previously, Dr. Shissias testified that at some point he prepared a physician's order for Levin to receive 60 hours of attendant nursing care. However, during cross examination he admitted to not knowing when the order was created.

Q: When was that order issued?

A: I don't recall.

Q: More than five years ago?

A: I don't recall.

---

[8] During trial, Plaintiffs' counsel made reference to a June/July 2014 physician's order prepared by Dr. Shissias, Levin's neurologist.  Purportedly, the order indicates that Levin should receive 60 hours of attendant nursing care per week.  This request for additional nursing services was presented to SCDHHS in October 2014.  However, even assuming *arguendo* that SCDHHS' failure to provide these services constitutes a violation, this incident does not present a continuing violation such that the statute could be tolled because Plaintiffs' complaint only alleges that an isolated incident, the 2010 reductions, were unlawful.  Moreover, this 2014 request to SCDHHS does not act to fill the gap between 2011, when the statute ran, and 2014, when this new alleged violation occurred.  Other issues related to the physician's order are discussed elsewhere in this Order.
[9] However, even to the extent Plaintiffs' claims had been properly filed, they still would still be subject to dismissal on the merits, as addressed *infra*.

Q: Was it written since the inception of this lawsuit? And I'll tell you the filing date was January of 2012.

A: I don't know. I don't have that information.

(Transcript, Feb. 24, 2015, p. 22-23).

Counsel presented lengthy oral argument to the Court on this issue; however, the physician's order was not entered as an exhibit during trial, so the Court has not had the benefit of reviewing its contents. During argument on this issue, Plaintiffs' counsel represented that the order was written during June or July of 2014, and the services were requested by Self in October of 2014.  Carmen Hay, Levin's caseworker, also testified that these services were requested by Self in October of 2014.

SCDHHS argued this issue is not ripe for adjudication because the required release forms, which are necessary to obtain all relevant physician records in order to evaluate the need for additional services, have not been submitted by Self.  As such, SCDHHS has not had the opportunity to officially review the request and make any kind of agency determination.  In opposition, Plaintiffs' counsel argued that Self's failure to execute the release forms requested by SCDHHS are a "big so what" because Self signed a general release when Levin entered the HASCI waiver program that permits information related to Levin's medical condition to be shared with SCDHHS.  However, SCDHHS contends the releases are necessary because each physician's office requires their execution prior to production of documentation on a patient in order to ensure compliance with HIPAA.[10]

As a result of the limitations imposed by Article III, ripeness is one of the many justiciability doctrines federal courts give consideration to in determining whether a case or

---

[10] HIPAA refers to the Health Insurance Portability and Accountability Act of 1996, and was passed by Congress to protect "the privacy of health information in the midst of the rapid evolution of health information systems." *South Carolina Medical Ass'n v. Thompson*, 327 F.3d 346, 348 (4th Cir. 2003).

controversy exists. Ripeness is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administration policies and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–149 (1967). In assessing whether a claim is ripe, courts must consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior,* 538 U.S. 803, 808 (2003) (citing *Abbott Labs.,* 387 U.S. at 149.). In light of these considerations, "[a] case is fit for judicial decision where the issues to be considered are purely legal ones and where the agency rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings. *Charter Fed. Sav. Bank v. Office of Thrift Supervision,* 976 F.2d 203, 208 (4th Cir.1992) (citing *Abbott Labs.,* 387 U.S. at 149.).

It is clear to the Court this issue is not ripe. Irrespective of any debate regarding the forms that may be required for release of Levin's medical records, SCDHHS has not made any official determination, whether it be acceptance or denial, of these requested services. The absence of a final agency decision on this issue creates a ripeness problem before this Court. "Where an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758-59 (4th Cir. 2013) cert. denied, 134 S. Ct. 1538, 188 L. Ed. 2d 556 (2014); *See also, Franks v. Ross,* 313 F.3d 184, 195 (4th Cir.2002) (where county and state agency had "interwoven involvement" in a permitting process, controversy was not ripe until the completion of the final step of the process); *Charter Fed. Sav. Bank v. Office of Thrift Supervision,* 976 F.2d

203, 208–09 (4th Cir.1992) (where an agency was required to make multiple decisions and take several actions before an injury could occur, the issues at hand were not ripe for judicial decision).

Further, because the requested services have not been denied by SCDHHS, the possibility still exists that Levin will be deemed eligible for the benefits.  If such approval was ultimately given by SCDHHS, Plaintiffs' current claim before this Court would be moot.  Therefore, it is obvious to the Court that Plaintiffs' claim of denied services for the 2014 request rests entirely upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580–581 (1985)).  Any judicial intervention at this stage would impinge upon SCDHHS' authority to determine whether the additional requested services should be provided.  Although Medicaid is governed by federal statute, state governments are responsible for its administration. *McGhee v. Dir., Dep't of Mental Health and Hygiene,* No. 97–2588, 1998 WL 403329, *3 (4th Cir.1998) (unpublished table decision). Thus, "basic notions of federalism and comity counsel that the state system should first make a final determination" before this Court intervenes.  *Id.*

Moreover, the Court does not find that delayed review would cause hardship to Levin. Levin's own physician testified that he believed any *further* reduction would result in danger to Levin; however, he was not aware that the 2010 reduction had even taken place.  There is no evidence to suggest that the services Levin is currently receiving will be terminated or reduced during the period of time necessary for SCDHHS to make a decision as to Levin's 2014 request. Therefore, the Court grants SCDHHS' motion to strike evidence related to Levin's 2014 request for additional services.

### C.  ADA and § 504 Rehabilitation Act Claims[11]

The ADA was enacted by Congress in 1990 and provides that no qualified individual with a disability "shall by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132.   For purposes of the Act, a qualified individual is defined as a person with disabilities "who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  Id. at § 12131(2).   The ADA does not require that public entities provide "services of a personal nature, including eating, toileting, or dressing"; however, those states that elect to offer such services, are required to do so "in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. §§ 35.135, 35.130(d).  This implementing regulation of the ADA is commonly referred to as the "integration mandate."  An analogous provision exists for § 504 of the Rehabilitation Act and requires recipients of federal funds to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).  In light of the fact that both the ADA and § 504 impose the same integration mandate, it is appropriate for the Court to consider both of these claims together.  Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013).

The antidiscrimination requirement of Title II was specifically addressed in the Supreme Court's decision in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999), wherein the Court set forth that "unjustified institutional isolation of persons with disabilities is a form of discrimination." Id. at 600.  The Court went on to hold,

---

[11] Despite the fact that the Court has found Plaintiffs' claims under the ADA and § 504 of the Rehabilitation Act to be untimely based on the statute of limitations, assuming arguendo that these claims were timely, the Court elects to address the merits of Plaintiffs' claims.

> [U]nder Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with disabilities.

*Id*. at 607.

However, "[r]egarding the State's obligation to avoid unjustified isolation of individuals with disabilities, the Attorney General provided that States could resist modifications that would fundamentally alter the nature of the service, program, or activity." Id. at 597 (citing 28 C.F.R. § 35.130(b)(7) (internal quotation marks omitted). In practice, Title II's requirements and the *Olmstead* decision "extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings." *Pashby* at 321 (citing U.S. Dept. of Justice, *Statement of the Department of Justice on the Integration Mandate of Title II of the ADA and Olmstead v. L.C.*).

In light of the Court's rulings previously articulated *supra*, the issue before the Court under Levin's ADA and § 504 claims in Phase I is whether SCDHHS' reduction in benefits as a result of the cap on services under the Medicaid HASCI waiver program puts Levin at serious risk of institutionalization. Given the limited scope of Phase I, Dr. Shissias' testimony is most helpful to the Court in deciding this issue.

During direct examination, Dr. Shissias, testified about his opinion regarding Levin's risk of institutionalization.

Q:  Do you have any opinion, Dr. Shissias, about whether Rob Levin is at risk of institutionalization?

A.  Very high, very severe risk.

Q:  Can you tell me about that? Can you tell me how you came to form that opinion?

A:  He has a very dedicated group of people that are working around him and that there's a very specific ritual in terms of how his care is administered every day in order to reduce the risk of decubiti, aspiration pneumonia, other bodily wounds, make sure that he is properly cleaned, and that he is properly fed and hydrated.  And this pattern of care has made it possible for Rob to continue to survive in his present state.

Q:  Without the nursing services that you've ordered and the – tell me, what you had determined that he needs.

A:  Well, I think we have ordered a minimum of 60 hours nursing care.

(Trans., p. 10)

While Dr. Shissias appears to offer an opinion that Levin is at risk of institutionalization, it appears to the Court that the 2014 order for 60 hours of nursing care is the sole basis for that opinion. In support of their position, counsel for Plaintiffs even argued "[Dr. Shissias] is saying what [Levin] needs to avoid institutionalization is at least 60 hours of nursing services, and he needs an attendant there 24 hours a day." (Trans., p. 28).  Therefore, to the extent Dr. Shissias' opinion is that Levin is at serious risk of institutionalization unless he receives the 60 hours of nursing care ordered in 2014, this issue is not ripe for the Court's consideration for the reasons already set forth *supra*.  Further, this testimony strays from the pertinent issue the Court must decide. This opinion only addresses the effect of not receiving more services, rather than addressing the effect of the actual reduction in services that occurred as a result of the 2010 waiver caps. For these reasons, it cannot be the basis upon which the Court grants the relief requested by Plaintiffs.

Later, on cross examination, Dr. Shissias was questioned regarding the current services Levin receives and his risk of institutionalization now as a result of those reductions.

A:  My interpretation of what you are saying is that if Health and Human Services reduces the amount of care that's provided in the home, do I think he's more likely to end up institutionalized? Yes, because I don't think one person or a family can care for him without help.

Q:  Okay.  Now, what services have been reduced to lead you to believe that –

A:  I'm not aware of anything that's been reduced. I think I guess I was sort of under the impression that is what we were maybe discussing and then the court would decide that.

Q:  Okay.  So, again, going back to my previous question, if he continues to receive the services that he has been receiving for the past couple of years?

A:  Yes.

Q:  Does that alter your opinion that he's going to have a risk of institutionalization if he continues to receive these services?

A:  I think the risk is always there.  I think that if we reduce the care I think the risk rises.

Q:  So there's no increased risk and there's a potential for increased risk if we decrease the services, but if the services stay the same then it's just the same risk that he would always face as a person suffering from this injury?

A:  Yes.

(Trans., p. 24-25).

Based on this testimony, the Court is not persuaded that Plaintiffs have met their burden. Dr. Shissias readily admitted that he was not aware of any reductions that had been made to Levin's services by SCDHHS, despite the fact that Levin's attendant care nursing services were reduced by one hour per day in 2010.  Most importantly, Dr. Shissias testified that if Levin's care remains at its current level (i.e. 2010 reduced level), Levin is at no greater risk of institutionalization than he has always been given his condition.

Accordingly, in light of the evidence, the Court is constrained to find that Plaintiffs have not met their burden of establishing by a preponderance of the evidence that SCDHHS' reduction in services under the Medicaid waiver program has placed Levin at serious risk of institutionalization.  In doing so, the Court is cognizant of Plaintiffs' difficult situation and admires the heroic emotional and physical effort Self expends on a daily basis for her son's benefit.  By all accounts, Self provides exemplary care for Levin, and the Court has no doubt that

22

Self's situation is one that most all can sympathize with.  However, the Court is bound by the law and cannot allow emotional considerations to cloud the issues presented here.

## IV.    CONCLUSION

Based on the record before the Court, the evidence presented by the parties, and the arguments of counsel, SCHDDS' motion for judgment as a matter of law on Plaintiffs' causes of action under the ADA and § 504 of the Rehabilitation Act is **GRANTED**. Given this ruling, Phase II of the bench trial is no longer necessary.

Plaintiffs are instructed to file a brief outlining the specific allegations related to their § 1983 claim for violation of the Medicaid Act, including a detailed explanation of the equitable relief sought.  This brief is not to exceed fifteen (15) pages, including attachments, and should be filed within ten (10) days of the entry of this Order.


IT IS SO ORDERED.


March 16, 2015                                    Joseph F. Anderson, Jr.
Columbia, South Carolina                  United States District Judge