IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Robert Levin, and Mary Self, Mother of Robert Levin,<br><br>           Plaintiffs,<br><br>vs.<br><br>South Carolina Department of Health and Human Services,<br><br>           Defendant. | C/A No. 3:12-cv-0007-JFA<br><br><br>**ORDER** |

## I.    INTRODUCTION

This case arises out of the reduction in benefits provided to a Medicaid-eligible individual and seeks to challenge the policies and procedures in the operation of the Head and Spinal Cord Injury ("HASCI") Medicaid waiver program.  In the Second Amended Complaint, Robert Levin ("Levin"), and Mary Self ("Self"), Mother of Robert Levin (collectively "Plaintiffs") allege numerous causes of action; however, as a result of dispositive motions and the first bench trial, Plaintiffs' only remaining cause of action is for violation of 42 U.S.C. § 1983 against the South Carolina Department of Health and Human Services ("SDHHS").[1] (ECF No. 72).

After the first bench trial, the Court requested briefing on the § 1983 claim, and by order dated April 20, 2015, the Court granted partial summary judgment to SCDHHS on Plaintiffs' § 1983

---

[1] The Court granted summary judgment in favor of SCDHHS on Plaintiffs' causes of action for alleged violations of (1) statutory and constitutional due process, (2) the S.C. Administrative Procedures Act, and (3) the Medicaid Act (ECF No. 131).  After the first bench trial, the Court granted SCDHHS' Motion for Judgment as a Matter of Law on Plaintiffs' causes of action for alleged violations of the American's with Disabilities Act and § 504 of the Rehabilitation Act. (ECF No. 184).

claim for the alleged violations of 42 U.S.C. § 1396a(a)(3) (Fair Hearing Provision), 42 U.S.C. § 1396a(a)(8) (Reasonable Promptness Provision), and 42 U.S.C. § 1396a(a)(10) (Amount, Duration, and Scope) (ECF No. 193). The remaining § 1983 alleged violations were heard via a second bench trial held on February 27, 2015, February 28, 2015, and March 5, 2015. In light of the complexity of the issues involved in this case and the judicial resources already expended hearing summary judgment arguments, conducting a prior bench trial, and preparing two detailed, lengthy orders on those claims, at the close of evidence the Court requested the parties submit a "Statement of Facts Proven" with citations to the record for the Court's consideration in preparation of this order.[2] (ECF No. 207).

At the conclusion of the second bench trial, the Court initially indicated that it would read the parties' briefs and possibly conduct another hearing for counsel to present closing arguments. However, the Court finds that closing arguments would not aid in its decision-making process.

Therefore, after careful examination of the parties' submissions and the substantial record in this case, this written order serves as the Court's ruling on Plaintiffs' remaining claims under 42 U.S.C. § 1983. Further, in accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure, this order details the Court's findings of facts and conclusions of law on the evidence presented during the second bench trial.[3]

---

[2] The parties' deadline for submission of their "Statement of Facts Proven" was June 22, 2015. SCDHHS filed its statement timley. (ECF No. 239). Plaintiffs filed an incomplete statement and requested an additional 48 hours for submission of their completed statement. (ECF Nos. 240 and 241). The Court granted the request and gave Plaintiffs an additional eight days to file their submission. (ECF No. 242). Plaintiffs filed their amended statement on June 30, 2015. (ECF No. 245).

[3] The Court has already provided a detailed recitation of the statutory framework of the Medicaid Act, as well as information related to Levin's condition, in its prior order. (ECF No. 184). The parties also agreed that relevant testimony provided at the first bench trial would be considered in ruling on the merits of Plaintiffs' claim for the second bench trial. As such, to the extent the findings of fact and conclusions of law rendered in the Court's prior order have any bearing on the rulings made on Plaintiffs' § 1983 claims, those findings and conclusions are deemed incorporated herein.

## II.    FINDINGS OF FACT

Based upon the testimony adduced at the second bench trial held on February 27, 2015, February 28, 2015, and March 5, 2015, the Court makes the following findings of fact.[4]

### A.  Witness Testimony[5]

1. Plaintiffs presented seven live witness to testify before the Court on the remaining claims under 42 U.S.C. § 1983: George Maky, Thomas Waring, Beverly Buscemi, Lennie Mullis, Jarrett Crandall, Mary Self, and Deborah McPhearson.

2. George Maky is the Division Director of Community Options at SCDHHS. In his position, Maky works with SCDDSN in the administration of the waiver program; however, SCDHHS is responsible for the overall administration of the waiver program and has final say on all issues.  Maky explained that in 2010 when the waiver caps were instituted, the nursing services criteria did not change, only the number of hours covered by the waiver changed.  Despite the cap of hours, individuals were allowed to receive additional hours for other services to compensate

---

[4] During the bench trial, the Court was extraordinarily lenient with Plaintiffs' presentation of evidence and essentially allowed all evidence to be presented, with the understanding that the Court would determine the appropriate weight, if any, to be given during its review of the record. In support of their claims, Plaintiffs have submitted a plethora of documents.  While some of these documents bear on the issues currently before the Court, others are either improper for the Court's consideration or are wholly irrelevant to the instant case.  For instance, Plaintiffs seek to admit pleadings, hearing transcripts, depositions, and orders from other unrelated cases involving SCDHHS.  *See e.g.,* Plaintiffs' Exhibit 8, 12, 13, 14, 27, 52, 61, 62, 79, 80, 83, 84, and 85. The Court finds these documents to be void of any relevant information, as required by Rule 401 of the Federal Rules of Evidence and declines to consider them. Additionally, the Court has also excluded from consideration any testimony related to this evidence.

[5] The summaries that follow represent, in many instances, only a small portion of the testimony provided by each witness.  After careful review of the record, the Court has determined that large sections of testimony elicited by Plaintiffs are irrelevant to the current issues before the Court.  For example, Plaintiffs' counsel spent significant time discussing the parameters and functionality of the ID/RD (a.k.a. MD/RD) waiver program.  However, the only waiver program at issue in this case is the HASCI waiver program. As such, this testimony is not helpful to the Court in issuing a ruling as to Levin's claims. Additionally, these witness summaries do not include testimony related to issues the Court has determined, *infra,* are improperly pled or are improperly before it, such as issues related to budgetary schemes and financial accountability. The Court also declines to consider testimony related to the claims of Richard Stogsdill for the reasons articulated by the Court in its order of November 10, 2014. (ECF No. 131). Also excluded from these witness summaries is testimony bearing on issues previously decided by the Court, which have no relation to Plaintiffs § 1983 claims. The Court also takes this opportunity to note that a summary of Jarrett Crandall's brief statements from the second bench trial is not included for these same reasons.

for the reduction.  Due to the purpose and structure of the waiver program, in order to receive benefits, individuals in the program cannot also be in an institutional setting. Even though hours have been limited since imposition of the waiver caps, Maky is not aware of any participant being forced to go into an institutional setting as a result of the changes to services. The waiver program uses a targeted case management system in which a service coordinator develops a plan for an individual and identifies the needs and services to meet the needs. It is the job of the service coordinator to inform waiver participants of the feasible alternatives under the waiver.  Based on the assessed needs of the participant, the service coordinator is required to provide information on the services available under the waiver to meet those needs. Maky stated service coordinators are also required to monitor waiver services.

3. Thomas Waring is the Associate State Director at SCDDSN and oversees the accounting, purchasing, engineering and information technology divisions of the agency.  Waring was the agency budget director in 2010 at the time the waiver caps were put in place.  Overall, most of the services provide under the waiver are provided in the community.  Since implementation of the waiver caps, the Department no longer has nursing outliers, which were allowed for based on a physician's order and permitted additional funding for services to cover care needs.

4. Beverly Buscemi began working for SCDDSN in February of 2008 as the facility administrator at Midlands Center, one of the regional centers operated by DDSN. In November of 2009 she assumed the position of state director.  In general, in order to qualify for services under the waiver program, an individual has to meet institutional or nursing home level of care.  Under the HASCI 2010 waiver caps participants are

4

allowed a maximum of 60 hours per week of LPN care or 45 hours per week of RN care.  Buscemi is not aware of any person who has been institutionalized as a result of the reduction in services under the waiver caps. No formal study has been conducted to determine whether the caps in services have resulted in participants being institutionalized.  However, she stated the Department does close financial tracking, quarterly financial reports, and end of year reports.  Through those reports SCDDSN would be able to ascertain the difference between money spent before the caps were put in place and after the caps went into effect.  Buscemi explained the Centers for Medicare and Medicaid Services ("CMS") does not allow duplication of services between the state Medicaid plan and the waiver program, so CMS instructed the state of South Carolina to remove physical therapy, occupational therapy, and speech therapy from the list of services provided under the waiver.

5. Lennie Mullis is a psychological consultant who provides counseling and behavior support as part of the waiver program to participants; however, she does not provide any services to Levin.  Mullis indicated two of the individuals she provided services to were forced to go into placement due to services being cut as a result of waiver caps. Neither of these individuals were HASCI waiver participants. In her experience dealing with participants, if a family needs a service, it is requested, and the service is not available, the family is not informed of a possible alternative.

6. Mary Self is Levin's mother and provides care to her son at home.  After Levin had been living at a nursing home for several years and Self elected to move Levin from an institutional setting into her home, the HASCI waiver administrators informed her of the services that were available. Self does not feel it is her responsibility as the

parent to tell the service coordinator what the feasible alternatives are under the waiver.

7. Deborah McPherson[6] is a former employee of SCDDSN and SCDHHS. She also served as a commissioner on a local DSN board. McPherson believes the goal of the waiver program is to serve an individual in the community in order to avoid costly institutional care. Under the wavier, an individual must meet the level of care for institutional care, and then services are provided in the community at equal or less cost than providing those same services in an institutional setting.

8. Plaintiffs also presented the deposition testimony of several witnesses: Marion Burton, Peter Ligett, Kara Lewis, Elizabeth Hutto, and Anthony Keck.[7]

9. Peter Ligett is the Deputy Director for Long Term Care and Behavioral Health at SCDHHS. He has held that position since March 2013 and helps to oversee the waiver programs provided by SCDHHS. According to Ligett, the case manager for each participant works to make arrangements to obtain the care needed, as long as medical necessity has been established. The case managers provide linkage and care coordination for people who need services that might not be provided by a primary provider. Case managers can identify the needs of a particular participant and get the

---

[6] Plaintiffs also submitted the transcript of McPherson's deposition taken in *Protection and Advocacy for the People With Disabilities, Inc., et al. v. South Carolina Department of Disabilities and Special Needs, et al.*, 07-CP-40-2187, (Sept. 23, 2011) for consideration. After review of the designated portions, the Court has determined that the testimony is not helpful in deciding the issues currently presented in this case. Much of the testimony is either irrelevant, discusses issues already decided by this Court, or focuses on issues for which Plaintiffs have no private right of action and/or no standing, as more fully explained *infra*.

[7] Plaintiffs designated lengthy portions of each witness's testimony, essentially requiring the review of all depositions *in toto*. (e.g., designation of 124 pages of a 172 page deposition, designation of 90 pages of a 114 page deposition, designation of 61 pages of a 67 page deposition). After review of all these transcripts, the Court has determined, much like the live witnesses, a significant portion of the testimony presented is not helpful to the Court in rendering a decision on Plaintiffs' remaining claims. As such, only the relevant portions are included, and a summary of Marion Burton and Anthony Keck's testimony is not included.

required services. Ligett indicated it is expected that service coordinators have experience and knowledge regarding the services available under the waiver.

10. Kara Lewis is employed with SCDHHS and worked as a liaison for the DDSN waivers. The HASCI waiver is a home community based program that is designed to support individuals that live in the community and serves participants jointly through SCDHHS and SCDDSN. Within the HASCI waiver program the service coordinator is responsible for assisting recipients with assessing whether or not a need is proper and legitimate.

11. Elizabeth Hutto is an attorney for SCDHHS and serves as the Deputy Director of the Department. The targeted case manager/service coordinator is the person in charge of getting services for a waiver participant. The case manager guides the individual through the process in order to get the services needed.

### B. Plaintiffs' Claims

12. The only remaining claim before the Court is for purported violations of 42 U.S.C. § 1983. Within that claim, the alleged violation of four specific provisions of the Medicaid Act remain: (1) 42 U.S.C. § 1396a(a)(17) (Reasonable Standards), (2) 42 U.S.C. § 1396a(a)(30) (Payment of Rates), (3) 42 U.S.C. § 1396n(c)(2) (Feasible Alternatives), and (4) 42 C.F.R. § 441.302 (Protection of Waiver Participants and Financial Accountability).

IV.    CONCLUSIONS OF LAW

## A.  *SCDHHS' Motion in Limine*

Prior to commencement of the second bench trial, SCDHHS filed a motion *in limine* seeking a ruling that there is no private right of action enforceable via suit under 42 U.S.C. § 1983 for violations of 42 U.S.C. § 1396a(a)(30) and 42 C.F.R. 441.302(b) and that all evidence related to these allegations be excluded from the trial.  (ECF No. 203).  The Court deferred ruling on this motion because it was filed one day prior to trial, and Plaintiffs' counsel had not had an opportunity to fully brief the issue.  As such, the Court allowed full presentation of evidence and testimony on both of these alleged violations during the bench trial, with the understanding that a ruling on SCDHHS' motion would be addressed in this order.  Plaintiffs' counsel submitted a brief on this issue on May 8, 2015.[8]  (ECF No. 214).

Suits brought pursuant to 42 U.S.C § 1983 provide a private right of action to individuals who have suffered a violation of a right afforded to them in the United States Constitution by someone acting under the purported authority of one of the sovereign states.  *Hafer v. Melo,* 502 U.S. 21, 27 (1991) ("Through § 1983, Congress sought 'to give a remedy to parties deprived of constitutional rights, privileges and immunities by a [state] official's abuse of his position.'") (quoting *Monroe v. Pape,* 365 U.S. 167, 172 (1961)).  Relevant jurisprudence assessing § 1983 claims makes clear that in order to seek redress, "a plaintiff must assert the violation of a federal

---

[8] In their brief, Plaintiffs argue that SCDHHS' motion *in limine* is essentially "another bite at the apple" inasmuch as SCDHHS failed to raise the arguments prior to the day before trial.  Plaintiffs also contend that exclusion of their evidence at the second bench trial on these issues would be prejudicial.  (ECF No. 214).  While the Court agrees that SCDHHS' motion could have been filed at an earlier stage in this litigation, the motion addresses issues of this Court's subject matter jurisdiction, which can be raised by any party at any time or even *sua sponte* by the Court. *United States v. Beasley*, 495 F.3d 142, 147 (4th Cir. 2007); *Plyler v. Moore*, 129 F.3d 728, 732 n. 6 (4th Cir. 1997). Additionally, any perceived prejudice to Plaintiffs has been minimized, if not eliminated, by the Court, as Plaintiffs were allowed to make a full record, presenting all evidence and testimony on these issues.  Further, the Court extended the deadline to file a responsive brief to SCDHHS' motion when the first deadline was missed by Plaintiffs' counsel. Under these circumstances, the Court finds that Plaintiffs' arguments of prejudice are without merit.

8

*right,* not merely a violation of federal *law.*" *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 106 (1989) (emphasis in original). This is so because § 1983 merely acts as a procedural conduit, allowing suit in federal court for the violation of a federal right that has been created by the federal constitution or a federal law. As such, § 1983 itself does not confer any substantive rights. *See Amato v. City of Richmond*, 875 F.Supp. 1124, 1132-33 (E.D.Va. 1994) (noting that § 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.") Accordingly, "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979).

> i.    *42 U.S.C. § 1396a(a)(30)(A)*[9]

Plaintiffs assert SCDHHS has violated a provision of the Medicaid Act that provides for payment of rates for care by failing to pay rates that are sufficient to provide access to services Levin needs in order to remain in the community. Specifically, Plaintiffs maintain that the rates paid to respite caregivers are significantly low, which creates a hardship on individuals who want to remain in their homes.

The relevant subsection of § 1396a that Plaintiffs allege has been violated requires the state plan to:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1396b(i)(4) of this title) as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough

---

[9] In their Statement of Facts Proven submitted to the Court after the conclusion of the second bench trial, Plaintiffs state with regard to their allegation of violation of 42 U.S.C. 1396(a)(30), "Counsel has learned that since this lawsuit was filed, DDSN has dramatically increased rates paid to respite caregivers. Plaintiff[s] appear[] to have prevailed on this significant issue." (ECF No. 245). The brief contains no additional argument or factual evidence on this claim. Plaintiffs have not moved to voluntarily dismiss this cause of action or make their abandonment of this claim clear. As such, the Court will address the merits of Plaintiffs' 42 U.S.C. 1396(a)(30) allegation.

> providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area

42 U.S.C.A. § 1396a(a)(30)(A) ("§ 30(A)").

Thus, the essential issue the Court must decide is whether Plaintiffs are precluded from bringing suit via a § 1983 claim for the enforcement of this provision because the statute does not allow for a private right of action. The fundamental inquiry used to determine whether the Plaintiffs are entitled to maintain a claim under § 1983 for violation of § 30(A) of the Medicaid Act is: Did Congress intend to create a private right of action? In answering this question, the Supreme Court has established a three part test for assessing whether a particular statutory provision gives rise to a federal right. This test requires the Court to evaluate whether: (1) Congress intended that the provision in question benefit the plaintiff, (2) the plaintiff has demonstrated that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence, and (3) the statute imposes a binding obligation on the States by using mandatory, rather than precatory, terms. *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997).

As congressional intent is the focus of the *Blessing* test, a cause of action cannot lie if Congress "specifically foreclosed a remedy under § 1983." *Blessing* at 341 (citing Smith *v. Robinson,* 468 U.S. 992, 1005, n. 9 (1984)). Congress may foreclose a remedy expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983. *Id*. (citing *Livadas v. Bradshaw,* 512 U.S. 107, 133 (1994)).

Since the *Blessing* decision, the Supreme Court has further clarified the standard for evaluating whether a statute creates a private right of action. *See Gonzaga v. Doe*, 536 U.S. 273 (2002). In *Gonzaga* the Court repeatedly stressed that it is Congress's use of explicit,

individually focused, rights-creating language that reveals congressional intent to create an individually enforceable right in a spending statute.[10] *See Gonzaga*, 536 U.S. at 283-83 ("[T]he question whether Congress intended to create a private right of action is definitively answered in the negative where a statute by its terms grants no private rights to any identifiable class.") (quotation marks and alterations omitted). As a rule, "where the text and structure of a statute provide no indication that Congress intend[ed] to create new individual rights, there is no basis for a private suit . . . This is so because *rights,* not the broader or vaguer 'benefits' or 'interests,' [are to] be enforced under the authority of [§ 1983]." *Doe v. Kidd*, 501 F.3d 348, 356 (4th Cir. 2007) (citing *Gonzaga* at 283, 286) (emphasis in original).

### a. Intention to Benefit Plaintiffs

Accordingly, in order for Plaintiffs to have a viable private right of action, it must first be evident from the language of the statutory provision in question, § 30(A), that Congress intended to benefit plaintiffs, i.e. that Congress intended to benefit recipients of Medicaid.[11] This Court's review of § 30(A) reveals that its primary focus is the obligation of the States to provide care in general terms, by setting forth operational requirements, as well as implementing and developing "methods and procedures." The statute targets the methodology to be used by the States and sets forth general objectives. Most notably, § 30(A) is devoid of any language focusing on the specific category of entity or person specifically protected. The only mention made of those receiving care is one reference to the "general population." Such broad and diffuse terms cannot be said to specifically convey any intent by Congress that § 30(A) benefit recipients of Medicaid, which would create an enforceable right.

---

[10] The Medicaid Act was promulgated under Congress's spending power. *See Pharm. Research & Mfrs. of Amm. v. Walsh*, 583 U.S. 644, 882-83 (2003) (Thomas, J. concurring).

[11] In light of *Gonzaga*, the Court understands this to essentially mean Congress's intent to create a right enforceable under § 1983.

11

This reasoning is analogous to that employed by other courts that have evaluated § 30(A). *See Bio-Medical Applications of NC, Inc. v. Electronic Data Systems Corp.*, 412 F.Supp.2d 549, 553 (E.D.N.C. 2006) ("Rather than focusing on the individual, the language of [§ 30(A)] is akin to the type of institutional policy and practice language that the Supreme Court specifically found did not support a finding of Congressional intent to create individual rights.") (citing *Gonzaga*, 536 U.S. at 288); *Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 57 (1st Cir. 2004) (finding that § 30(A) "has no rights creating language and identifies no discrete class of beneficiaries"); *Sanchez v. Johnson*, 416 F.3d 1051, 1059 (9th Cir. 2005) (finding that § 30(A) "refers to the individual only in the context of describing the necessity of developing state-wide policies and procedures [and] does not reflect a clear Congressional intent to create a private right of action"); *Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697, 703-04 (5th Cir. 2007) (finding § 30(A) does not confer a private right of action because the "provision speaks only in terms of institutional policy and practice, has an 'aggregate' rather than an individualized focus, and is not concerned with whether the needs of any particular person or class of individuals have been satisfied").

The Court finds there is no clear Congressional intent that § 30(A) benefit Plaintiffs, as required by the first prong of the *Blessing* test. As such, there is no specific, rights-creating language that allows for a private right of action by Plaintiffs. *Gonzaga*, 536 U.S. at 282 (when a "provision focuse[s] on the aggregate services provided by the State, rather than the needs of any particular person, it confer[s] no individual rights and thus [cannot] be enforced by § 1983."). Having found that § 30(A) fails the first prong of the *Blessing* test, it is not necessary for the

Court to address the two remaining elements.  Therefore, Plaintiffs' claim under § 1983 for the alleged violation of § 1396a(a)(30)(A) fails as a matter of law.[12]

### b.   42 C.F.R. § 441.302

As part of their § 1983 claim, Plaintiffs also seek redress for SCDHHS' alleged violation of 42 C.F.R. § 441.302.  Specifically, Plaintiffs contend SCDHHS violated this federal regulation by acting with conscious indifference to Levin's needs in violation of its obligation to ensure the protection of waiver participants and by failing to financially account for the Medicaid program.  SCDHHS contends "to the extent Plaintiff[s] seek[] to present testimony regarding financial accounting to Medicaid, there is no private cause of action."[13]   (ECF No. 203). SCDHHS' objection centers on subsection (b) of the regulation which states,

> The agency will assure financial accountability for funds expended for home and community-based services, provide for an independent audit of its waiver program (except as CMS may otherwise specify for particular waivers), and it will maintain and make available to HHS, the Comptroller General, or other designees, appropriate financial records documenting the cost of services provided under the waiver, including reports of any independent audits conducted.

42 C.F.R. § 441.302(b).

While it is clear that an alleged violation of a statutory right can give rise to a feasible § 1983 claim, the issue presented to the Court here is whether such viability extends to the violation a federal regulation. The majority of circuits attempting to resolve whether a regulation, standing alone, can provide a right enforceable via § 1983, have found that it cannot, where there is an absence of any implicit recognition of an enforceable right in the regulation's enforcing

---

[12] As noted by the Court throughout this litigation, Plaintiffs have only sought equitable relief in their Complaint. To the extent Plaintiffs would argue this entitles them to bring a private cause of action based on perceived violations of § 1396a(a)(30)(A) that argument is rejected.  Plaintiffs' request for equitable relief cannot be used as a mechanism to circumvent Congress's exclusion of private enforcement of § 30(A) of the Medicaid Act via a § 1983 claim. *Armstrong v. Exceptional Child Center, Inc.*, 135 S.Ct. 1378, 1386 (2015) ("Section 30(A), fairly read in the context of the Medicaid Act, displays an intent to foreclose the availability of equitable relief.") (citing *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 653, 647 (2002) (internal quotation marks omitted)).

[13] SCDHHS has not argued that Plaintiffs do not have a private right of action for their allegation that the Department failed to ensure the protection of waiver participants, as found in 42 C.F.R. § 441.302(a).

statute. *See Save Our Valley v. Sound Transit*, 335 F.3d 932, 939 (9th Cir. 2003) (finding that the Supreme Court's decisions in *Sandoval* and *Gonzaga*, taken together compel the conclusion "that agency regulations cannot independently create rights enforceable through § 1983"); *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 274 F.3d 771, 784 (3d Cir. 2001) ("language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not"); *Harris v. James*, 127 F.3d 993, 1008 (11th Cir. 1997); *Mungiovi v. Chicago Hous. Auth.*, 98 F.3d 982, 984 (7th Cir. 1996) ("None of the Supreme Court's cases beginning with *Thiboutot* uses § 1983 to enforce a federal regulation that creates a right independent of any federal statute. And for purposes of other statutes with structures similar to that of § 1983, we have held that regulations are *not* laws.") (emphasis in original). Additionally, our own circuit has acknowledged that "[r]ights created by regulation alone, if rights can be so created, probably cannot form the basis for a § 1983 action." *Ritter v. Cecil Cnty. Office of Hous. & Cmty. Dev.*, 33 F.3d 323, 327 (4th Cir. 1994).

A similar view appears to have also been adopted by the Supreme Court. As the crux of private right conferment centers on Congressional intent, the Supreme Court has held that regulations alone cannot create a private right of action where Congress has not chosen to authorize one. *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) (finding that "[I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice, but not the sorcerer himself."); *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 437-38 (1987) (O'Connor, J., dissenting) (expressing concern that ill-defined statutory rights, which are more firmly established by regulation, not become "unleashed from any connection to congressional intent"). Accordingly, regulations have been found to act as tools for "fine-

tuning" statutes. *Brinkley v. Hill*, 981 F. Supp. 423, 439 (S.D.W. Va. 1997) (holding no cause of action under § 1983 for violation of 45 C.F.R. §§ 303.6 and 303.10, and finding, "[t]he regulations are meant to "fine tune" the statutes in question and are not the sort of laws violation which give rise to individually enforceable rights under § 1983").

Here, Plaintiffs have only alleged the violation of a federal regulation and have failed to provide the Court with any relevant statutory law. Without more the Court is constrained to conclude that § 441.302(b) does not confer an individual private right of action enforceable under § 1983. In the same vein, the Court must also find that § 441.302(a)[14] does not create a private right of action. Accordingly, the Court finds that § 441.302, by itself, is not enforceable under § 1983 because it does not unambiguously confer a private right of action.

### B.  *42 U.S.C. § 1396a(a)(17) – Reasonable Standards*

As part of their § 1983 claim, Plaintiffs have also alleged that SCDHHS has violated the Medicaid Act's reasonable standards provision in failing to establish rules and standards for determining eligibility for and the extent of medical assistance needed, by allowing agency employees to make rules in an arbitrary and capricious manner and by allowing persons who are not physicians to override physician's orders. Plaintiffs contend that SCDHHS has also failed to defer to treating physicians in determining the medical necessity of services.

In light of the testimony presented at the second bench trial, as well as the briefs submitted by the parties, it is clear to the Court that an assessment of Plaintiffs' standing to pursue their claim for violation of the reasonable standards provision is warranted. In the simplest of terms, a plaintiff's standing to sue "is the threshold question in every federal case,

---

[14] Section 441.302(a) requires states to provide "[a]ssurance that necessary safeguards have been taken to protect the health and welfare of the beneficiaries of the services." Plaintiffs' allege that SCDHHS acted with conscious indifference to Levin's needs in violation of its obligation to protect waiver participants.

determining the power of the court to entertain the suit." *Goldstein v. Costco Wholesale Corp.*, 278 F. Supp. 2d 766, 769 (E.D. Va. 2003).  Only if Plaintiffs have standing to sue do they present a case or controversy between themselves and SCDHHS within the meaning of Article III of the Constitution.  *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102 (1998). Standing, therefore, is a fundamental component of a court's subject-matter jurisdiction. *Id.; Pye v. United States,* 269 F.3d 459, 466 (4th Cir.2001).  As subject-matter jurisdiction presents a threshold matter, a challenge to a particular party's standing is permissible at any time because "[s]tanding represents a jurisdictional requirement which remains open to review at all stages of the litigation." *Lott v. Scottsdale Ins. Co.*, 811 F. Supp. 2d 1224, 1232 (E.D. Va. 2011) (citing *Nat'l Org. for Women v. Scheidler,* 510 U.S. 249, 255 (1994)).  While litigants may initiate a standing argument, courts are also free to raise the question of subject matter jurisdiction *sua sponte* at any time before final judgment. *United States v. White,* 139 F.3d 998, 999–1000 (4th Cir. 1998).

The Supreme Court has established a three part test for assessing a plaintiff's standing: (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) (internal quotations marks and citations omitted). As in all cases, Plaintiffs bear the burden of establishing injury, traceability, and redressability because they are seeking to invoke federal jurisdiction. *Friends*

16

*for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (citing *Defenders of Wildlife,* 504 U.S. at 561; *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231 (1990)).

Review of the evidence presented in this case fails to establish any injury to Plaintiffs for the alleged violation of the reasonable standards provision.  Plaintiffs' Statement of Facts Proven details at length evidence related to budgetary issues and the process utilized for institution of the 2010 waiver caps.[15]  Plaintiffs cite to, among other things, the South Carolina Comptroller's Report, Accountability Reports, Audit Reports, and memoranda from the director of SCDDSN; however, none of this documentation provides evidence of a concrete and actual injury sustained *by Plaintiffs*.   In fact, Plaintiffs never argue how these perceived inadequate standards have resulted in harm to them.   In the questioning of witnesses, Plaintiffs' counsel posed numerous hypothetical questions regarding what could possibly happen if "X" set of circumstances occurred related to Levin, but none of these speculative scenarios are sufficient to show a concrete, imminent injury. Further, the testimony elicited by Plaintiffs regarding the process used for awarding services to participants, even if it can be construed as demonstrating a lack of reasonable standards as Plaintiffs adamantly suggest, provides no connection to Levin or any harm suffered by him.  Additionally, examples of alleged misconduct from other cases related to services provided to other participants, including the legal and factual arguments made by those individuals, also fails to establish the requisite injury in fact required for standing.[16] In other words, Plaintiffs have failed to show that Levin requested services, the orders of Levin's physicians were ignored by SCDHHS, and Levin has suffered injury.

---

[15] The Court has already granted SCDHHS summary judgment on Plaintiffs' cause of action for violation of the South Carolina Administrative Procedures Act. (ECF No. 131).  As such, testimony related to the alleged improper process used to implement the waiver program is not relevant to the remaining claims under 42 U.S.C. § 1983. Moreover, because the Court has determined, *infra*, that Plaintiffs do not have a private right of action enforceable via a § 1983 claim for financial accounting, testimony related to budgetary issues is also not relevant.

[16] As repeatedly reiterated by the Court, this case is not a class action lawsuit.  Plaintiffs have never sought, nor have they been granted, class action certification as contemplated by Rule 23 of the Federal Rules of Civil Procedure.

Moreover, Plaintiffs sought admissions from many witnesses that SCDHHS has failed to conduct studies on: (1) whether capping waiver services actually produced cost-saving results to the program, and (2) whether any participants had to be institutionalized after services were capped under the waiver. However, without anything more than Plaintiffs' inferential argument that such studies might reveal problems as a result of the waiver caps, there is no demonstrable proof of any injury to waiver participants in general, much less injury to Levin.[17]  It is evident that Plaintiffs are attempting to point out all perceived misdeeds of SCDHHS; however, such broad strokes miss the mark and do not paint the picture Plaintiffs intend.

Likewise, Plaintiffs have not shown a nexus between the actions of SCDHHS and any alleged injury.  A large majority of Plaintiffs' evidence is actually traceable to SCDDSN, a non-party to this litigation.[18]  In support of their position, Plaintiffs look to the testimony of several witnesses, including: Linda Veldheer, who gave specific information regarding the rules and procedures of SCDDSN with regard to waiver participant needs and assessments of requests for additional services; Tom Waring, who testified about the reductions in services as a result of the waiver caps; Beverly Buscemi, who provided additional information on the waiver caps and budget problems; and Deborah McPherson, who provided testimony about being a commissioner of SCDDSN.[19]  All of this evidence relates to issues already ruled upon by this Court, issues for which the Plaintiffs have no private right of action, issues which are no longer relevant to the current claims, or issues related to SCDDSN that Plaintiffs' suggest are problematic.  As is abundantly clear, SCDDSN is not a party to this litigation; therefore, Plaintiffs' attempts to trace

---

[17] The only testimony regarding participants relocating to institutional settings was given by Lennie Mullis.  Mullis recalled two individuals who were forced into placement as a result of the waiver caps.  (ECF No. 281, p. 102-04, 113).  However, on cross examination, Mullis admitted that neither of these individuals were HASCI waiver participants.  (Id. at 118).

[18] As already indicated, the evidence presented by Plaintiffs related to SCDHHS fails to show any injury suffered by Levin as a result of actions taken by SCDHHS.

[19] As previously noted, Plaintiffs have also relied upon impermissible evidence, including hearing transcripts and depositions conducted in other unrelated lawsuits involving SCDHHS.

their claims to SCDDSN cannot provide standing.[20]  In the same vein, any remedy fashioned by this Court for the alleged violation of the reasonable standards provision by SCDDSN would not constitute proper redressability because SCDDSN is not a defendant in this action. [21]

Therefore, the Court finds that Plaintiffs lack standing to bring a claim for violation of 42 U.S.C. § 1396a(a)(17).

### C.  42 U.S.C. § 1396n(c)(2)(C) – Feasible Alternatives

The feasible alternatives provision of the Medicaid Act requires states to inform the legal representative of participants of the feasible alternatives under the waiver program and give the choice of either institutional or home and community-based services when the participant is determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility.  The genesis of Plaintiffs' claim is that they were not properly advised of these alternatives, specifically, additional services for nursing care.[22]  SCDHHS argues in response that it is not required to provide such information because Levin is not at risk of re-institutionalization.  In other words, SCDHHS takes the position that it is required to provide Plaintiffs with the feasible alternatives available under the waiver only if it is determined that

---

[20] Plaintiffs' elected not to purse litigation against SCDDSN, despite several amendments to their complaint. However, as the Supreme Court has aptly noted, "the plaintiff is the master of the complaint and has the option of naming only those parties the plaintiff chooses to sue." *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 91 (2005). Additionally, none of the parties have sought joinder of SCDDSN.

[21] Testimony presented demonstrates that SCDHHS has contracted with SCDDSN to provide the day-to-day care to participants under the waiver program; however, the Court finds that such a contractual relationship does not cure the standing problem presented here. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (finding that "simply being a party to [a] contract does not alone establish Article III standing");  *Drayton v. Ozmint*, No. CIV.A. 8:10-2079-HFF, 2010 WL 4922698, at *1 (D.S.C. Nov. 3, 2010) *report and recommendation adopted*, No. CIV.A. 8:10-02079, 2010 WL 4922692 (D.S.C. Nov. 29, 2010) ("The Court cannot issue an order directed at non-parties.");  *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 110, 88 S. Ct. 733, 738, 19 L. Ed. 2d 936 (1968) ("a judgment is not . . . legally enforceable against, a nonparty").

[22] While the Court has ruled that Levin's 2014 request for nursing services is not ripe because SCDHHS has not made a final agency determination regarding whether the services will be provided (ECF No. 131), SCDHHS' alleged failure to inform Plaintiffs of these services, prior to the request, does not present a ripeness problem.

Levin must be placed in an institutional setting. The Court disagrees with this interpretation of the statute.

In 1981, Congress created the Home and Community-Based Waiver Program so that individuals who would otherwise be cared for in an Intermediate Care Facility for Individuals with Intellectual Disabilities ("ICF/IID")[23] could receive services in their own homes and in home-like settings. *Michelle P. ex rel. Deisenroth v. Holsinger*, 356 F. Supp. 2d 763, 768 (E.D. Ky. 2005). Under the Medicaid Act, a state is required to ensure that

> individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded

42 U.S.C. § 1396n(c)(2)(C).

The regulation explaining the basis and purpose of the waiver program provides that, "Section 1915(c) of the Act permits States to offer, under a waiver of statutory requirements, an array of home and community-based services that an individual needs to *avoid institutionalization.*" 42 C.F.R. §§ 441.300 (emphasis added). Under the waiver provisions of the Act, states may include as "medical assistance" the cost of home or community-based services which, if not provided, would require care to be provided in an ICF/IID. 42 U.S.C. §§ 1396n(c); 42 C.F.R. §§ 435.217. As plainly stated in the regulation, the entire purpose of the program is to avoid institutionalization. Ergo, the waiver program avoids institutionalization by providing services in home and community-based settings that otherwise would have to be provided in an institution.[24] The nature of the program itself, as an alternative program, suggests

---

[23] These facilities were formerly known as Intermediate Care Facilities for Individuals with Mental Retardation (ICF/MR). *See* ROSA'S LAW, PL 111-256, October 5, 2010, 124 Stat 2643.
[24] *See* testimony of Debra McPherson indicating that the goal of the waiver program is to serve individuals in a community setting in order to avoid costly institutional care. (ECF No. 219, p. 23).

20

that all participants are at some risk of institutionalization.[25] By its very terms, the statute imposes an obligation to inform. Accordingly, the Court finds SCDHHS has a continuing obligation to provide participants with the feasible alternatives under the program, to the extent the participant qualifies for the service.

Having found that SCDHHS has an ongoing obligation to inform waiver participants of the feasible alternatives available under the program, the Court turns to the question of whether such alternatives were adequately provided to Plaintiffs related to nursing services.[26] As an initial matter, it was evident through the testimony of George Maky, Linda Veldheer, Peter Ligett, Kara Lewis, and Elizabeth Hutto that the service coordinator is responsible for ensuring that participants are informed of the feasible alternatives under the waiver. (ECF No. 217, p. 62-63; ECF No. 238, p. 165-66; ECF No. 231, p.16; ECF No. 229, p. 15; and ECF No. 227, p. 87). During both bench trials, lengthy testimony was presented on the issue of Plaintiffs' 2014 request for nursing services. While much of that testimony centered on other issues not relevant to the current inquiry, both Self, Levin's mother, and Carmen Hay, Levin's case coordinator, testified regarding the lack of information given to Self. When questioned about nursing services, Carmen Hay, admitted that she never told Self that such services were available.

Q: Did you ever tell [Self] that nursing was an option before she asked for it?

A: No.

(ECF No. 238, p. 197).

---

[25] As noted by the Court in its order on the first bench trial, the evidence presented did not demonstrate that Levin is at *serious* risk of institutionalization as contemplated by *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). *See* ECF No. 184). However, Dr. Shissias, Levin's treating physician, indicated there is always some risk of institutionalization, albeit not a serious risk, given the type of injury Levin has suffered. (ECF No. 237, p. 24-26). Moreover, as stated by Beverly Buscemi and Debra McPherson participants in the waiver program must generally require institutional or nursing level care in to qualify for services. (ECF No. 218, p. 58; ECF No. 219, p. 21-22).

[26] Plaintiffs presented some testimony regarding speech services for Levin, suggesting that this service was also never identified as a feasible alternative. However, given the testimony from Beverly Buscemi that speech services were removed from the waiver based on a directive from CMS, the Court finds that these services do not constitute a qualifying feasible alternative. (ECF No. 218, p. 31).

During her own testimony, Self indicated that she requested the nursing services for Levin after she was informed by her attorney that additional nursing hours were available. However, Self was not aware that additional hours were feasible until her attorney shared that information.

> A: And I honestly didn't know that nursing hours were available. That was never – [Attorney Harrison] provided me the information that they were available. I did not know they were available.
>
> Q:  Miss Harrison advised nursing hours were available?
>
> A: Yes.  And I was glad for that information.

(ECF No. 237, p. 124).

Based on the testimony of these two witnesses, it is apparent that SCDHHS failed to advise Self of the feasible alternatives under the waiver program.  As the Court has already stated, SCDHHS is not required to apprise participants of every possible alternative; however, it does have a duty to ensure that participants are made aware of the feasible alternatives.   In all the testimony solicited during both bench trials, additional nursing services were never deemed to be an unfeasible alternative for Levin under the HASCI waiver program.  As such, SCDHHS, via the service coordinator, should have educated Self on the nursing service alternatives available for her son.

## IV.    CONCLUSION

Based on the record before the Court, the evidence presented by the parties, and the arguments of counsel, SCDHHS' motion *in limine* as to Plaintiffs' causes of action under 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. 441.302 is **GRANTED**.  The Court finds that Plaintiffs do not have standing to bring a cause of action for violation of the reasonable standards provision, 42 U.S.C. 1396a(a)(17), and **DENIES** any relief requested by Plaintiffs for that cause

of action. Further, the Court **DECLARES** that SCDHHS violated 42 U.S.C. § 1396n(c)(2)(C) in failing to advise Plaintiffs of the feasible alternative of nursing services under the HASCI waiver program.  Given the events that have transpired since SCDHHS' failure to advise Plaintiffs, the Court deems injunctive relief unnecessary.

IT IS SO ORDERED.

July 28, 2015                                  Joseph F. Anderson, Jr.
Columbia, South Carolina                       United States District Judge