IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Richard Stogsdill, and Nancy Stogsdill, Mother of Richard Stogsdill,<br><br>           Plaintiffs,<br>vs.<br><br>South Carolina Department of Health and Human Services,<br><br>           Defendant. | C/A No. 3:12-cv-0007-JFA<br><br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter is currently before the Court on the recently concluded bench trial of those claims remaining in this action. The parties presented evidence on July 8, 9, 12 and 19, 2021. On Plaintiffs' request, the Court also accepted proposed findings of fact and conclusions of law from each party. (ECF Nos. 466 & 467). Upon receiving and reviewing the proposed findings and conclusions, the Court heard additional argument on August 16, 2021. After receiving the testimony, carefully considering all of the evidence, weighing the creditability of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52. The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

## I.    PROCEDURAL HISTORY

Prior to delving into the testimony and exhibits presented during this bench trial, the Court feels that a brief recitation of the complex procedural history is necessary to fully understand the issues remaining in this action.

This case originated out of the reduction in benefits provided to two Medicaid-eligible individuals, Richard Stogsdill ("Richard") and Robert Levin, and the impact upon their mothers, Nancy Stogsdill ("Nancy") and Mary Self, respectively. Plaintiffs initiated this suit by bringing claims against various state and federal agencies and their respective officials. Initially, this Court adjudicated Levin's claims but abstained from adjudicating Richard's claims pursuant to the *Rooker-Feldman* doctrine and other prudential abstention grounds. Plaintiffs' first appeal to the Fourth Circuit was remanded for lack of appellate jurisdiction. (ECF No. 266). Essentially, the Fourth Circuit determined that this Court had failed to rule on Plaintiffs' discrete retaliation claims[1] and remanded for further proceedings. On remand, this Court held another bench trial in which it determined that Plaintiffs had not proven a claim for retaliation. Plaintiffs again appealed.

The Fourth Circuit concluded the second appeal by affirming the judgments of this Court in nearly all respects. (ECF No. 357). However, the Fourth Circuit also held this Court erred in dismissing Stogsdill's claims against the state defendants for lack of jurisdiction under the *Rooker-Feldman* doctrine and in otherwise abstaining from

---

[1] The Fourth Circuit did note that this Court did not adjudicate these retaliation claims "through no fault of its own, given the complexity of the plaintiffs' complaint and the minimal factual development of the retaliation claims – and thus had not issued a final judgment." *Stogsdill v. S.C. Dep't of Health & Human Servs.*, 674 F. App'x 291, 293–94 (4th Cir. 2017).

reviewing the claims. *Stogsdill v. Azar*, 765 F. App'x 873, 881 (4th Cir. 2019). When the Court abstained from deciding the issues presented by the Stogsdill plaintiffs, Richard's claims were then pending before the state courts. By the time this case reached the Fourth Circuit a second time, the intervening period had allowed the state courts to conclude their work. Therefore, abstention was clearly no longer appropriate.

Consequently, Richard and Nancy's claims within the Second Amended Complaint ("SAC") (ECF No. 72) were revived and remanded for further proceedings. Upon remand, the only remaining defendants were Anthony Keck[2] and the South Carolina Department of Health and Human Services ("SCDHHS" or "DHHS"). Although the Fourth Circuit held that abstention was not applicable in this case, it did state that "ordinary preclusion principles still apply." (ECF No. 357, p. 14). Thus, the parties were asked to provide additional briefing on the application of preclusion doctrines to these remaining claims.

Prior to ruling on this issue, this Court held a status conference wherein both parties represented that Richard had initiated further proceedings before the Administrative Law Court and was appealing preliminary decisions. The parties also represented that they were attempting resolution of Plaintiffs' requests and hoped they could reach a settlement. Consequently, the undersigned stayed all proceedings to allow the parties to work towards an amicable resolution. (ECF No. 379). Sometime thereafter, the parties submitted a status

---

[2] Defendant Anthony Keck was then dismissed via this Court's order dated March 23, 2020 because claims against both Keck and SCDHHS are duplicative as any judgment rendered against Keck in his official capacity as director of SCDHHS would be tantamount to a judgment against SCDHHS itself. (ECF No. 381).

report in which they advised that Plaintiffs' administrative appeal had been resolved by consent order in which Richard "received all relief which may be granted." (ECF No. 380-1).

Accordingly, this Court then ruled on the preclusion issues and asked the parties to provide additional briefing as to the effect of that consent order on the claims remaining here (i.e., whether the consent order rendered the remaining claims moot). (ECF No. 381). After additional briefing, this Court then issued an order in which it held that, of those claims remaining, Plaintiffs' causes of action contained in Claims 4 and 6 of the SAC had not been completely mooted by the consent order. (ECF No. 395). Although Plaintiffs' claims regarding a desire for increased nursing hours were moot, the claims as related to the ongoing need for medical equipment were not moot. Thus, the remaining claims at issue from Plaintiffs' SAC include Violations of Section 504 of the Rehabilitation Act[3] (Claim 4) and Violations of 42 U.S.C. § 1983[4] (Claim 6)—but only as related to the need for medical equipment.

Consequently, the Court then allowed a brief period of discovery to ascertain Richard's current need, if any, for medical equipment. Thereafter, the Court proceeded to

---

[3] Plaintiffs' § 504 claim is based upon allegations that SCDHHS has failed to make funds available, failed to make reasonable modifications to the waiver programs, failed to provide services in the least restrictive setting and failed to utilize criteria and methods of administration, all of which created an unnecessary risk of institutionalization and segregation prohibited by § 504.

[4] Plaintiffs' § 1983 claim seeks to remedy violations of certain provisions of the Medicaid Act including: claims related to the fair hearing system (42 U.S.C. § 1396a(a)(3)); reasonable promptness (42 U.S.C. § 1396a(a)(8)); amount, duration and scope (42 U.S.C. § 1396a(a)(10)); reasonable standards (42 U.S.C. § 1396a(a)(17)); and feasible alternatives (42 U.S.C. § 1396n(c)(2)).

4

the instant bench trial in this case. Shortly before the bench trial began, the Court held a pretrial conference wherein the parties advised that all of the medical equipment previously requested by Richard had been provided to him with the exception of a water walker. Moreover, the request for the water walker had been approved and payment authorized. The parties were waiting on payment to be sent to the water walker manufacturer who would then ship the device directly to Richard. Although it appeared that Richard had no further outstanding requests for medical devices or equipment, Plaintiffs maintained that a controversy still existed because their issue was, and always had been, centered around the process used to request and obtain medical equipment.[5]

Thus, the Court proceeded to the fourth bench trial in this case. Based on its intimate knowledge of this case and its prior experience with Plaintiffs' counsel in presenting evidence, the Court found it prudent to limit the presentation of evidence to 9 hours per side. (ECF No. 434). The Court granted Plaintiffs' counsel considerable leeway in presenting evidence she felt was relevant to the remaining claims subject only to this time limitation. The Court also granted Plaintiffs' midtrial request for additional time by offering another hour to each side. Plaintiffs' attorney was moreover granted additional time to cross examine Defendant's one rebuttal witness despite the expiration of her 10-hour limit. Defendant utilized only a fraction of the time allotted.

---

[5] Although previously dismissed as moot, Plaintiffs also contend that this process for requesting equipment is the same process used to determine the need for care hours and is problematic for many of the same reasons.

At trial, the Court received testimony from several witnesses including case managers Audry Grant,[6] Jessica Kibler,[7] and Mckenzie Johnson.[8] As Plaintiffs' counsel has done in the prior trials in this action, several witnesses presented provided little, if any, information relevant to Richard's claims. Moreover, the undersigned had to order several of Richard's case managers to appear *sua sponte*. These case managers had intimate firsthand knowledge of the processes Richard undertook for each piece of equipment and the Court found their testimony vital in determining the relevant facts in this action.

The Court would also note that Plaintiffs' counsel offered into evidence over 150 exhibits consisting of nearly 7,500 pages prior to this trial. A vast majority of the exhibits have no relevance to the remaining claims and were not used or referenced during trial.[9] Of these 7,500 pages, Plaintiff utilized less than 200 (less than 3%) during trial. Instead, Plaintiffs' counsel proceeded to introduce new exhibits (approximately 100 additional pages over and above the 7,500 previously identified) during trial despite the case being nine years old and discovery closing months prior to trial. Plaintiffs' counsel additionally submitted new witness affidavits and attachments which contained "newly discovered

---

[6] Grant is a case manager supervisor at Richland/Lexington Special Needs Board ("Rich/Lex").

[7] Kibler is Richard's current case manager at Rich/Lex.

[8] Johnson was Richard's prior case manager from 2015–2019 at an organization known as Bright Start.

[9] Several of the exhibits were full copies of depositions and transcripts of prior hearings in this case with no indication as to what portions, if any, were relevant.

evidence" [10] weeks after Plaintiffs rested their case.[11] (ECF Nos. 468 & 469). Moreover, several exhibits were misnumbered, omitted, or duplicated which caused numerous delays and confusion during trial. In order to provide Plaintiffs the opportunity to fully present their remaining claims with a complete record, the Court allowed in almost every piece of evidence or testimony offered by Plaintiffs' counsel.

Despite repeated requests for counsel to identify information and supporting evidence, the Court found it extremely difficult to extract specific facts, such as precise dates of equipment requests, necessary for adjudicating this action. However, this Court has attempted to untangle the convoluted sum of evidence presented to reach a final resolution of this case. From the testimony and voluminous exhibits presented, the Court finds the following facts and conclusions of law.

## II.    FINDINGS OF FACT

Richard, now in his mid-thirties, has had cerebral palsy since birth which has resulted in spastic quadriplegia. He requires the use of several pieces of medical equipment including a wheelchair, stander, gait trainer, and door opener as well as medical supplies such as catheters and urine collection bags. Richard also requires around the clock care and receives varying levels of service from providers throughout the day. Richard's mother, Nancy, serves as Richard's primary caregiver and point of contact. Richard is eligible for

---

[10] Despite being "newly discovered", these exhibits ranged in age from 9 months to several years old.

[11] To be sure, Defendant submitted additional affidavits and attachments as well, but did so only in response to Plaintiffs' untimely submissions.

both Medicare and Medicaid benefits. Because he is at risk of institutionalization, Richard is also entitled to additional benefits via the intellectual disability/related disability ("ID/RD")[12] wavier. The ID/RD waiver allows Richard to access additional services in the community without the need to be institutionalized.

The crux of Plaintiffs' claims centers on the byzantine process used to request medical equipment and the inevitable delay caused by trudging through the various pitfalls along the way. Plaintiffs have continued to complain about process issues regarding DHHS' failure to administer Medicaid waiver programs in compliance with federal and state law from the outset of this litigation. Thus, an explanation of the process in general is essential in adjudicating these claims.

The Request Process

Through the testimony of Nancy, the case managers mentioned above, and various state agency employees, the Court was able to piece together the process envisioned in requesting medical equipment by ID/RD wavier participants. Although each request for medical equipment may require some deviation from this specific procedure, the general process is outlined below.

Part of Richard's benefits include access to case management services. Case management organizations contract with and are funded by the Department of Disabilities and Special Needs ("DDSN"). Richard employs the use of a case manager to navigate the labyrinthine system used to request medical equipment, supplies, and services from

---

[12] Richard's cerebral palsy is considered a "related disability" thus entitling him to certain benefits under the ID/RD waiver.

Medicare and Medicaid. Richard has the freedom to choose the provider of his case management services. Richard previously utilized a case management company called Bright Start from 2014 through June 2019. He then transferred[13] to an independent case management company for a brief period before transferring to Oconee County Disability and Special Needs Board ("Oconee") on July 18, 2019. Richard then transferred from Oconee to Richland/Lexington Special Needs Board ("Rich/Lex") on August 3, 2020 because Oconee stopped providing case management services. Rich/Lex remains Richard's current case management provider.

The first step of case management services begins with Richard's annual assessment. Case managers are required to complete a written assessment every 365 days. Richard's assessment typically occurs sometime in August-September each year. This allows case managers an opportunity to meet with Richard and his care givers, such as his mother Nancy, to discuss his current condition and needs. From this assessment, the case manager completes the annual plan of care (also referred to as a "care plan" or "support plan"). Certain requests from care givers for medical equipment are included within the plan of care as "needs".[14] This plan of care is then submitted to the Waiver Administration Division ("WAD") of DDSN for approval. The plan of care was described as a "living

---

[13] Plaintiffs aver that they left Bright Start because the case manager was not providing adequate services. Nancy also took issue with a new Bright Start directive that required additional face-to-face visits which were burdensome for Richard.

[14] Although the care plan identifies certain "needs," this term is not synonymous with a determination of "medical necessity." A determination of medical necessity can only be made by a medical professional and is prerequisite to Medicaid funding. This medical professional need not be a recipient's primary physician but can also include other professionals such as a physical therapist.

document" that can be amended or updated by the case manager at any time via a change request. Thus, should the need for a new piece of equipment, or repair to an existing piece, arise after the annual assessment, a case manager may submit a change request to include the new need. DDSN, through the WAD, also reviews and approves each change request. No party disputes that Richard's needs for medical equipment occasionally change over time. For instance, his wheelchair or lift may need periodic maintenance, repair, or replacement. Additionally, he may outgrow certain pieces of equipment or his medical condition may change which will generate the need for a new piece of equipment.

After the care plan is approved, the case manager then works with the benefit recipient such as Richard (the "recipient") or his care giver, such as Nancy, to obtain necessary equipment. Once a piece of equipment is identified as a need within a care plan, the case manager will then work to obtain the necessary documentation and prepare a funding request packet to be sent to Medicare. Medicare is considered Richard's primary insurer and is the payor of first resort. The case manager often obtains a quote from an equipment provider and a prescription or related letter of necessity ("LoN") from a medical professional to submit with the request.[15] A recipient is entitled to freedom of choice and thus has the ability to choose his own provider for services or equipment.[16] 42 C.F.R. § 431.51. Oftentimes a case manager is called upon to provide recommendations for

---

[15] Recipients may sign releases that allow case managers to communicate directly with a recipient's physicians. However, the physician is under no obligation to comply with a case manager's requests.

[16] This freedom of choice also extends to case management services.

providers, but the recipient is entitled to make his or her own choices. The case manager often has prior experience with certain providers and has knowledge of those which are already enrolled with Medicare/Medicaid. Other times, a recipient or caregiver will choose a provider they have worked with in the past or otherwise prefer.[17] Evidence showed that case managers, recipients, and their care givers work as a team to obtain the necessary documentation. For instance, Nancy and a case manager would often discuss and decide amongst themselves who would be responsible for obtaining a specific LoN or quote from a provider.

Once a provider is identified and proper documentation gathered, the case manager coordinates with a provider to submit the request package to Medicare. The provider submits the request as it is a request for payment. However, the case manager continues to monitor the provider's request and deliver additional information or support if needed. If approved by Medicare, payment is authorized, and the provider may then supply the piece of equipment. Once the equipment is supplied, payment to the provider is then issued.

If Medicare denies a request, the provider may then request payment from Medicaid (also referred to as "state plan Medicaid" or simply the "state plan"). Participants in South Carolina submit their requests to Medicaid through a third-party administrator known as Kepro. Kepro conducts reviews of requests for medical equipment including an assessment of medical necessity and may then approve or deny the request. If approved, payment is

---

[17] Evidence indicated Nancy has a great deal of past experience with certain providers, such as National Seating and Mobility ("NSM"), and would often request they be used as Richard's equipment provider without the need for referrals from a case manager.

authorized, and the provider may then supply the piece of equipment. If denied, the equipment provider may then request a reconsideration. Several witnesses in the trial before this Court stated that only providers are allowed to request a reconsideration from Kepro. Recipients are not able to participate in the Kepro process. No witness presented at trial knew the standards Kepro used in its assessment process.

After Kepro denies a reconsideration request, the case manager works with the provider to then submit the request through the ID/RD wavier. The ID/RD wavier is a subdivision of Medicaid and is considered the payor of last resort. If the request for equipment is denied by Kepro because it is not deemed medically necessary, the recipient may then submit a request on the grounds that the requested equipment may provide some remedial benefit or otherwise enhance independence. Evidence of this remedial benefit often requires additional documentation from a medical professional. If approved, payment is authorized, and the provider may then supply the piece of equipment. Once the equipment is supplied, payment to the provider is then issued. Case managers continue to monitor progress after payment is authorized to ensure the device or service is actually delivered and satisfactory.

If the request for equipment is denied by the ID/RD wavier, the recipient may request a reconsideration from DDSN. If the reconsideration is denied, the recipient may then file an administrative appeal through the Division of Appeals and Fair Hearings at DHHS.[18] If the fair hearing appeal is not resolved in the recipient's favor, he may then

---

[18] The parties appear to agree that the jurisdiction of the fair hearing division extends only to suspensions, terminations, denials, or failure to provide equipment or services. Thus, the fair

appeal the fair hearing decision to an administrative law court. Administrative law court decisions may then be appealed directly to the South Carolina Court of Appeals.

The exact time required to provide an approval or denial from each of these three steps (Medicare, Medicaid, ID/RD wavier) is unknown and varies from situation to situation. However, testimony indicated that 10 to 14 days to receive a response from each of the three levels was not unusual.

Throughout this process, case managers note the status of such requests in a computer program known as Therap. Personnel at DHHS and DDSN also have access to this Therap program. Nancy does not have access to Therap. Although she testified that she had previously requested access to Therap, Nancy could not remember when or to whom such a request was made. Testimony showed that at least one other recipient has been given access to Therap. However, no one testified as to the level of access to Therap or any other information specific to this other recipient's individual situation. No witness was able to identify what measures, training, or costs would have to be put in place to provide recipients and caregivers access to Therap. At all times, the case manager works as the recipient's liaison between the caregivers, various governmental agencies, Medicare, Medicaid, and providers to supply information and support needed to effectuate these requests. Accordingly, the Court acknowledges that it may be beneficial to provide recipients or caregivers access to Therap, but there is no indication that caregivers such as

---

hearing division does not have jurisdiction to issue constitutional determinations or otherwise determine if alleged actions violate the reasonable promptness mandate, the amount duration and scope mandate, the ADA, or the Rehabilitation Act.

Nancy could not obtain the same information or receive status updates by simply calling or emailing their case managers.

In receiving testimony from various case managers at different agencies, it became apparent that these case managers are extremely involved in the process and vital in ensuring requests are processed correctly and timely.[19] Additionally, the case manager closely monitors the progress of any request made and keeps the recipient or caregiver informed of that progress. Richard's current case manager meets with him quarterly and at least two of these visits are face-to-face within his home. Case managers also make monthly calls to recipients to note their current status and additional needs. Other than qualms with a certain manager at Bright Start, Nancy testified that case managers were readily available to answer her questions and provide assistance. Nancy and her attorney Patricia Harrison[20] regularly communicated with case managers via phone calls and emails.

This precise process is not specifically explained within any written manual or procedures readily available to recipients or their care givers. However, case managers were readily available to help recipients and care givers with their requests. Additionally, the case managers stated that they could reach out to personnel at DDSN or DHHS for assistance in this process at any time. Certain portions of the process, such as coding used

---

[19] If the Medicare/Medicaid regulatory scheme can be described as the dreadful underworld in which Plaintiffs purportedly find themselves when making requests, then these case managers serve as the ferryman on the river Styx.

[20] Harrison has served as the Stogsdill's attorney throughout this federal litigation as well as in their various state administrative proceedings. Moreover, Harrison was heavily involved in day-to-day dealings and communications with case managers, DHHS, DDSN, and other entities. Several of Harrison's own emails were used as exhibits in trial.

to request common pieces of equipment or procedures to request a fair hearing, are available in writing in various locations such as the DDSN Wavier Manual or the DHHS website.

Moreover, this process is subject to variation depending on each specific request. For instance, case managers may be aware that a particular piece of equipment may not be covered under Medicare and will thus proceed directly to Medicaid via Kepro. Certain requests, such as repairs or maintenance to existing equipment, would not require documentation from a medical professional. In other instances, a provider may need additional information prior to providing a quote and submitting a request. For instance, the provider may need to request measurements from the recipient or schedule a home visit to assess the device or service needed. Moreover, medical professionals may require in person fittings or evaluations prior to preparing the necessary LoN. No witness at trial knew the standards utilized by Kepro in determining whether a device was medically necessary, or the criteria used in evaluating requests.

No witness at trial was familiar with a specific "reasonable promptness" mandate or knew of any 90-day requirement for the provision of equipment or services.

With this general process in mind, the Court now turns to Richard's specific requests for equipment.

Water Walker

Richard previously utilized a water walker[21] which he has since outgrown. Richard's most current care plan dated October 5, 2020 identified a new water walker as a need. There was no evidence of any procurement activity related to the water walker from any party until January 22, 2020 when Richard's current case manager, Kibler, communicated with Nancy and her attorney to learn that Nancy had reached out to the provider and requested a quote. At that point, the case manager had yet to receive any quote or LoN.

Kibler later received a quote of approximately $250 from the water walker manufacturer on March 2, 2021. This water walker is a specialized device available only through a specific manufacturer known as Theraquatics.[22] Upon receiving the quote, the case manager conferred with Nancy and Harrison about the need for a doctor's LoN. Nancy then volunteered to request a LoN and/or a prescription from Richard's physician.[23] Shortly thereafter, Richard needed immediate medical attention and the COVID-19 pandemic escalated in the United States. These two factors caused a 3-week delay in Nancy's ability to request a LoN from Richard's physician. The case manager spoke with Nancy on March

---

[21] A water walker is a device used to stabilize Richard during aquatic therapy.

[22] Theraquatics appears to be an Australian company with its American operations based in Montgomery, Alabama.

[23] Nancy and the case manager often discussed needs for additional documentation and would delegate the responsibility to obtain this documentation amongst themselves on a case-by-case basis. Nancy testified that she would volunteer to gather such information in an effort to expedite the process. However, she believed the case manager was the person responsible for gathering such documentation.

24, 2021 and Nancy confirmed she was still waiting to hear back from Richard's physician on the necessary documentation. Richard's physician ultimately faxed a copy of the LoN to the case manager on March 25, 2021. The case management office received the fax, but it was misplaced in a separate set of documents. In a monthly follow-up call on April 30, 2021, the case manager again inquired into the LoN and learned that it had been previously faxed. The physician then faxed another copy of the LoN to the case manager on the same day. Upon receipt of the LoN, that case manager had the necessary documentation to submit the request packet.

The request was then submitted through the ID/RD wavier and approved on May 3, 2021, after the case manager provided additional information about Richard's prior water walker to the WAD. The case manager informed Nancy and Harrison of the approval on the following day. For uncertain reasons, payment for this piece of equipment was required prior to the provision of the water walker.[24] However, before payment for the water walker could be issued, Theraquatics had to create an account in DDSN's electronic documentation system. This particular provider was not enrolled in Medicaid and thus could not bill directly for the equipment. Further, the provider, an out-of-state company, declined to enroll directly with Medicaid. Therefore, Richard's case manager had to request payment be made by his financial manager, Kershaw County Disabilities and Special

---

[24] As stated above, payment was normally authorized prior to the provision of equipment but not issued until after the equipment had been received.

Needs Board ("Kershaw").[25] Kershaw initially refused to issue payment. Richard's case manager then followed up with a DDSN agent Carol Mitchell to identify the issue with Kershaw's refusal to pay. After further conversations, Mitchell confirmed that DDSN would reimburse Kershaw for the water walker payment and Kershaw agreed that payment could be made.[26] Because the water walker provider was an out-of-state company not enrolled with Medicaid, additional steps had to be taken to verify their business license before payment could be authorized. Case management notes evidence the case manager's repeated efforts over the course of several weeks in attempting to confirm Kershaw would issue payment and gathering the necessary information to get Theraquatics approved for payment. After these delays, Kershaw issued payment for the water walker on July 7, 2021. Richard received the water walker on July 29, 2021.

Stander

Nancy expressed a desire for a stander to Richard's case manager at some point in early 2018. Records indicate that Dr. Jill Monger created a LoN for a stander on May 2, 2018. Additionally, quotes for a stander were generated no later than May 16, 2018. Emails between the provider, case manager, and WAD Director Ben Orner dated from June 27, 2018–September 5, 2018 show that the chosen provider was attempting to submit a request

---

[25] This process of acquiring payment through a special needs board is referred to as "board billing." If a provider is enrolled with Medicare/Medicaid, they may utilize "direct billing" to receive payment directly from Medicare. Although a provider must be given the ability to direct bill Medicaid for specialized medical equipment, supplies, and assistive technology, the providers are not required to enroll and direct bill.

[26] After making payment, Kershaw would then seek reimbursement from DDSN who would get payment from DHHS.

for payment to Kepro with no success.[27] After consulting with Richard's Bright Start case manager, the provider again submitted its request to Kepro utilizing different coding on September 6, 2018.

Medicaid, through Kepro, denied this request on September 12, 2018. This denial was evidenced in a letter to Richard dated September 21, 2018. This denial letter noted that a request for a stander was made by the provider National Seating and Mobility. However, the letter also stated the request was denied because: "Per physician review, 'long-term functional debility and wheelchair dependance, not clear that a stander will provide additional measurable benefit for this 31 year old patient.'" The letter also stated that "[w]e will be happy to send you a copy of the criteria we used for the review by calling 1(855)326-5219." The following information was also included:

> If you do not agree with this decision, you can send a letter asking for reconsideration. You must send a copy of this denial letter and any documents to show why you need the service within 60 days of the date this letter. You may submit your reconsideration request via fax, KEPRO Atrezzo Portal 1 or mail; however, the preferred method is fax (1-855-300-0082). If submitting via mail, reconsideration requests must be sent to:
>
> KEPRO
> 2810 N. Parham Rd.
> Suite 305
> Henrico, VA 23294
>
> If the service is denied again you will have the option to contact the SCDHHS Division of Appeals and Hearings and request a State Fair Hearing to appeal the decision. The denial notice that you receive after the reconsideration will explain the process to request a State Fair Hearing.

---

[27] The provider had apparently failed to show Medicare exhaustion in addition to using the wrong coding to request this particular piece of equipment.

A beneficiary may request an expedited appeal. SCDHHS will grant or deny these requests as quickly as possible. If we grant your request to expedite, your appeal will be resolved as quickly as possible instead of the standard 90-day timeframe. If we deny the request to expedite, the appeal will follow the standard 90-day timeframe.

SCDHHS may grant expedited review if we determine the standard appeal timeframe could jeopardize the individual's life, health, or ability to attain, maintain, or regain maximum function. SCDHHS may consider, among other facts:
• the medical urgency of the beneficiary's situation
• whether a needed procedure has already been scheduled
• whether a beneficiary is unable to schedule a needed procedure due to lack of coverage
• whether other insurance will cover most of the costs of the requested treatment.

You may request an expedited appeal at the same time you file your appeal request or after you file an appeal. Please state you are requesting an expedited appeal and explain why.

To avoid delays in the process, please submit any supporting documentation with the request for expedited review or immediately thereafter. While supporting documentation is not required, SCDHHS will make its determination based on the information made available at the time we consider the request.

If you have any questions please call us at (855) 326-5219.

    Sincerely,
    KEPRO South Carolina QIO Medical Management

This denial letter was sent directly to Richard and a similar letter was sent to the provider. Nancy testified that she never requested a reconsideration or attempted to contact Kepro as provided in the letter partly because she had been instructed that only providers could request reconsideration from Kepro. Emails dated September 24, 2018 indicate that the provider informed Richard's case manager that the stander request had been denied. Other emails on the same day show that Orner instructed the case manager that she or

Richard's attorney could work with the provider to appeal the denial if they felt the denial was not correct. Orner further advised the case manager that the ID/RD wavier was not likely to fund the stander for the same reasons unless a remedial benefit could be shown.

Richard's October 9, 2018 care plan again listed the stander as a need and noted that Nancy and Harrison were attempting to get documentation from Richard's physician to show the stander would provide a remedial benefit in support of a request for wavier funding. Case manager Johnson stated that Harrison volunteered to obtain additional documentation from Jill Monger to indicate the stander would provide a remedial benefit so they could request a reconsideration.

Case notes indicate that the case manager sent Harrison another copy of the denial letter on February 21, 2019, per Harrison's request. The case manager met with Nancy and Harrison on March 12, 2019 to again discuss the stander. A March 27, 2019 email from the case manager to Nancy indicated that the case manager was still waiting on additional information from Richard's physician to request the stander through the wavier.

Emails dated April 9, 2019 and April 17, 2019 noted that Harrison and Nancy had yet to provide the case manager with the documentation from a medical professional needed to show a remedial benefit prior to requesting wavier funding. Nancy then transferred Richard's case management services away from Bright Start in June 2019. Thus, a reconsideration or subsequent request was never initiated by this case manager.

Attorney Harrison then requested a reconsideration from DDSN in a letter written on November 11, 2019. This request for reconsideration was directed primarily at the reduction in Richard's nursing hours. The letter did mention medical equipment but did

not specifically identify the stander. DDSN director Mary Poole denied this request for additional nursing hours via letter dated November 22, 2019. Poole's letter did not address a request for a stander. Harrison then initiated an appeal of the denial of Richard's request for additional nursing hours and the denial of the stander on December 11, 2019 to the fair hearing division.[28] This appeal resulted in a January 28, 2020 consent order in which DHHS agreed to provide the stander for Richard in addition to providing the additional nursing hours requested. The stander was actually delivered to Richard on July 2, 2020. The provider apparently did not have this specific stander readily available to deliver and the delay from January 28, 2020 to July 2, 2020 was due to the provider's need to procure the stander requested.

Door Opener

Richard's residence had a door opener which was originally installed more than 10 years ago. Although Plaintiffs' counsel argued at trial that the need for a new door opener was originally identified in 2012, she has since noted this argument was in error. The need for repair to his existing door opener was first noted on March 21, 2019 when Harrison contacted the Bright Start case manager.[29]

Emails dated March 27, 2019 indicate that the case manager informed Nancy that her preferred provider, National Seating and Mobility ("NSM"), did not provide door

---

[28] The initial appeal notice did not specifically reference a stander but a later email from Harrison to DHHS dated December 17, 2019 confirmed that they were appealing the denial of the stander as well as the denial of additional nursing hours.

[29] Richard's October 9, 2018 care plan does not identify the door opener as a need.

openers and she would have to choose a separate provider. Later, on April 1, 2019, Nancy indicated that she had spoken with NSM and learned that they do provide door openers, but only out of their Charlotte office. The Bright Start case manager testified that she then made arrangements for a provider representative to stop at Richard's house and evaluate his needs on his next visit to Columbia. However, Nancy transferred Richard from Bright Start to Oconee before the provider could appear for the inspection. Plaintiffs presented no evidence as to any efforts made while at Oconee to request a door opener.

In August 2020, Richard transferred case management services from Oconee to Rich/Lex. The Rich/Lex case manager listed a door opener as a need on Richard's October 5, 2020 care plan.

Case manager notes indicate that Nancy requested a quote from the provider on November 17, 2020. Notes indicated that the case manager spoke with a NSM representative on December 22, 2020 to discuss his plan to inspect the current door opener the following Monday. The representative needed to inspect the current door opener to assess to the possibility of repair or the need for a full replacement. The case manager then received a quote for a full replacement of the door opener on January 7, 2021 and composed a change request to the care plan. This change request was immediately returned by DDSN and Kibler had to request additional information from Nancy including the age of the current door opener. Kibler submitted another change request with this additional information and the door opener was added to the plan of care the same day. Kibler informed Nancy and Harrison that the door opener had been approved and a request was sent to NSM to replace the door opener.

The door opener was installed no later than January 29, 2021. The door opener was funded through the ID/RD wavier. The case manager was able to get this request approved with only a quote and no need for a prescription or LoN.

Ankle Foot Orthoses

Richard has utilized ankle foot orthoses ("AFOs") for several years and Nancy discussed the need for new ones with Richard's Bright Start case manager in March 2019. That case manager provided Nancy with a list of AFO providers on March 27, 2019. However, Nancy transferred Richard from Bright Start before a request was ever made. Additionally, Plaintiffs presented no evidence of any requests for AFOs made while at Oconee. Richard then transferred to Rich/Lex in August 2020.

After transferring to Rich/Lex, AFOs were identified as a need in Richard's October 5, 2020 care plan. On December 4, 2020, notes show that the case manager received a prescription for AFO braces along with provider information. The case manager then informed Nancy as to her next steps in requesting the AFOs. On January 22, 2021, the case manager noted that Nancy had reached out to an AFO provider to request a quote but had yet to receive one. On March 24, 2021, the case manager called Nancy to check the status of the AFOs and learned that Richard had been experiencing some health problems that delayed his ability to go and get fitted for the AFOs. On this same day, the case manager also confirmed that the AFOs would be fully funded through Medicare or Medicaid. Nancy acquired these braces from the provider later that same day. There is no indication of when a quote from the provider was ever received.

Gait Trainer

The need for a new gait trainer (also referred to throughout trial via its brand name "Rifton Pacer" or erroneously as "Piston Racer") was identified in Richard's October 8, 2019 and October 5, 2020 care plans.[30] On November 17, 2020, Nancy contacted case manager Kibler to discuss the need for equipment including a gait trainer. Richard previously had a gait trainer obtained in 2014, but could no longer acquire replacement parts for it. Therefore, a new one would be needed. Nancy had requested quotes for this product and Kibler instructed her that medical justification would be needed as well.  On December 4, 2020, notes show that Kibler received a prescription for the gait trainer. On December 14, 2020, Kibler received a quote from NSM and then corresponded with a funding specialist at NSM regarding Richard's gait trainer. Notes indicate that Kibler "received and reviewed the quote, medical letter of necessity, and prescription for the item since Richard's family has expressed how much this item is needed since his current one is not working properly." Kibler submitted a request for the gait trainer on the same day and notified Nancy and Harrison of the request.  Kibler proactively submitted the request directly to the ID/RD wavier and had the provider simultaneously submit a request through Kepro to expedite the process. Kibler received notification from the provider on January 13, 2021 that Kepro had approved the gait trainer and it had been ordered from the

---

[30] Although Richard's 2012 care plan identified a gait trainer as a need, his October 2018 care plan did not identify a gait trainer as a need. Plaintiffs presented no evidence of efforts to obtain a gait trainer from 2012 to 2020.

manufacturer. Kibler informed Nancy and Harrison of this approval on the same day. The gait trainer was delivered to Richard on February 16, 2021.

Ceiling Lift

Richard utilizes a ceiling lift in transferring to his wheelchair. In October 2018, notes indicate the lift needed a new motor. This need was marked "completed" on March 22, 2019 along with the statement that "mom reported the lift is in fair condition and working for now."

Richard's October 5, 2020 care plan identified additional problems with the lift as a need. November 17, 2020 notes indicate Nancy called the case manager to inform her that Nancy had requested a quote for repairs. On January 8, 2021, Nancy avers that she was forced to pay $855.82 out-of-pocket to the provider for an inspection and battery needed for the ceiling lift.[31] Nancy asserts that she had to make an advanced payment before the provider would schedule an inspection and she had no time to wait for Medicaid approval. Although Nancy claims this cost should be covered by Medicaid and she should be reimbursed for the $855.82 that she paid out-of-pocket, she produced no evidence showing that she ever notified the case manager or another person at DDSN of this payment. She did not request reimbursement until August 10, 2021 (after trial) when her attorney emailed a request to in-house counsel for DHHS.

---

[31] Evidence of Nancy's out-of-pocket payment was not introduced until weeks after Plaintiffs rested their case. Despite this untimely production, the Court allowed in the evidence to form a complete record of Plaintiffs' claims.

Kibler's later notes stated that Nancy obtained a bill for needed repairs to Richard's lift on January 13, 2021. This bill showed a $0 balance. Apparently, Nancy never informed the case manager that she herself had paid this bill because on January 14, 2021, Kibler, believing the $0 balance to be erroneous, then contacted the provider to obtain a copy of the invoice that did not show a $0 balance. Kibler then composed a change request to request funding from the ID/RD wavier. The change request was approved the next day on January 15, 2021. Kibler informed Harrison and Nancy of this progress.

Kibler then received a second quote for repairs from the provider on January 22, 2021 and Kibler had to request additional documentation from the provider to clarify the additional costs. This second quote of $821.52 covered replacement of certain safety devices on the lift. Kibler then submitted a change request on the same day. She also communicated with the provider to learn that this invoice was different than one previously produced because the first invoice was for the battery to be replaced and the inspection and the second invoice was for the repairs to the safety equipment in the lift system. She added this information to the change request.

The change request was approved by the WAD on January 26, 2021. Kibler informed Nancy and Harrison of this approval on the same day. She also contacted the provider to inform them of the approval so they could schedule the repairs. On February 17, 2021, the case manager followed up with the provider to confirm the authorization and have the provider confirm they would complete the repairs. On March 1, 2021 Kibler again contacted the ceiling lift provider to inform the provider that the authorization for the

repairs was previously sent. The provider then notified Kibler that the necessary parts "have now shipped." The lift was repaired on March 26, 2021.

Plaintiffs further allege that they learned for the first time on August 10, 2021 that the bill for repairs to the safety features was sent to Kershaw and remains unpaid. However, Plaintiffs do not dispute that the actual repairs have been made and payment has been authorized. DHHS provided evidence that Kershaw mailed a check for $821.52 to the provider on July 29, 2021.

<u>Wheelchair</u>

The need for a new motorized wheelchair was listed in Richard's October 9, 2018 care plan. An email from Nancy to Richard's Bright Start case manager dated January 22, 2019, indicates that Nancy had a prescription and was in the process of scheduling an appointment with Dr. Jill Monger to have Richard fitted for his new wheelchair. Case management notes show that by March 22, 2019, Richard had been fitted for a wheelchair and was "still waiting on insurance approval." Plaintiffs presented no evidence as to what "insurance" this note refers to or the efforts made to get the funding approved. However, it is presumed this insurance refers to Medicare, Richard's primary insurer, given that notes dated May 2, 2019, state that Medicare approved funding the wheelchair. In the same notes, funding for a seat height adjustment accessory for the wheelchair was noted to be denied by Medicare but the case manager would request funding through the ID/RD wavier based on remedial benefit. Notes dated May 6, 2019 show that funding for the height adjustment accessory had been approved by the wavier. The case manager informed Nancy and Harrison of the approvals on the same day. Richard's wheelchair was delivered on

December 11, 2019. Plaintiffs presented no evidence as to the cause of delay between the May 2019 approval and December 11, 2019 delivery.

<u>Catheter Supplies</u>

For the first time in this litigation, Plaintiffs presented evidence at this trial of issues related to the funding of tubing used to connect Richard's catheter to his urine collection bag. Richard had recently received a denial of funding for this tubing from Medicaid. However, DHHS has been providing funding on 30-day intervals for this tubing through the ID/RD wavier on a temporary basis to ensure Richard has the necessary supplies. Witnesses at trial appeared to agree that the tubing provider had submitted a request for payment to Medicaid using the wrong coding. Thus, case managers were working with the provider to correct the code and resolve the funding issue.[32] There is no indication that Richard does not currently have the necessary supplies or that he is in immediate risk of going without them. Jennifer Jaques, a WAD supervisor, testified that a future request for temporary funding through the wavier would be approved if the funding issue with Medicaid could not be fixed before his supplies ran out. Moreover, Plaintiffs' proposed findings of fact has no reference to catheters whatsoever. Thus, there appears to be no issues which this Court can currently rectify and any ruling on this matter would be premature.

Throughout all of these processes, Nancy was in constant contact with Richard's various case managers. Moreover, Plaintiffs' attorney, Harrison, was present or included

---

[32] Testimony suggested that funding for these supplies should be provided by Medicaid without a problem if the correct coding was used.

in a vast majority of the contacts each case manager had with Richard and Nancy. Case managers Johnson and Kibler both stated it was a rare occasion in which they would communicate with Nancy without having Harrison present or copied on her communications. Harrison was present during face-to-face meetings, copied on email communications, and even communicated directly with case managers. Case manager records show that several conversations with Harrison were had in which she would request changes[33] to Richard's proposed plan of care prior to submission. Case managers would also work to keep Harrison updated along with Nancy.

### Other Witness Testimony

Apart from the case managers' and Nancy's testimony discussed above, Plaintiffs presented several other witnesses in their case-in-chief. A summary of their respective testimony is below.

### Deborah McPherson

Plaintiffs presented Deborah McPherson as one of their initial witnesses. McPherson is a former employee and commissioner for DDSN. She retired in 2009 and worked on the commission for DDSN from 2009–2014. McPherson had absolutely no knowledge of Richard's needs or particularized requests for equipment. It appears she was presented as a witness solely to voice her generalized concerns with DHHS including its failure to promulgate regulations and its handling of Medicare and Medicaid funding requests.

---

[33] Most of these changes were to modify the verbiage used in the care plan.

Margaret Alewine

Plaintiffs also called Margaret Alewine in their case-in-chief. Alewine is a program manager for community options within DHHS. This division has authority over the ID/RD wavier division. Alewine offered no specific insights as to Richard's dealings with DHHS and offered only her general knowledge of DHHS.

Tara Derrick

Similarly, Tara Derrick was presented as a witness. Derrick works at DHHS and her job responsibilities include helping determine which items of durable medical equipment are covered by Medicaid. She offered no testimony specific to Richard and added little, if anything, to the case. She did testify that she understood Kepro to have 15 days to review and respond to a request for authorization. She also testified that Richard's catheter tubing is covered under state plan Medicaid.

Jennifer Jaques

Plaintiffs additionally presented testimony from Jennifer Jaques. Jaques is a supervisor at the WAD and worked as a case manager for several years prior. Jaques prepared an assessment of Richard on July 28, 2015 after being given some of Richard's records by a DHHS attorney and Dr. Platt. Jaques did not perform any in-person interviews or speak with Nancy, Richard, or his case manager prior to drafting the assessment. This short assessment essentially concluded that additional in-person interviews and inspection of Richard's home would be necessary to provide a complete assessment of Richard's current condition and needs—including his need for medical equipment. This assessment

was apparently performed in response to the remand of Richard's parallel action in the South Carolina state court.[34]

Within the assessment, Jaques notes that an in-person consultation was needed, but Richard's attorney, Harrison, would not permit such an inspection. Later emails revealed that Harrison and Nancy requested an in-person inspection by Dr. Platt, but conditioned it on the presence of Richard's attorney, Harrison, or his godfather, who was also an attorney. Moreover, Harrison demanded that Dr. Platt disclose his contractual relationships and financial dealings with DHHS or DDSN prior to the evaluation. It does not appear that Dr. Platt ever performed an in-person inspection. However, there is no indication that Richard did not thereafter continue to receive his annual assessments and follow up visits from his respective case managers. It is unclear what relevance, if any, Jaques' testimony, or prior assessment has on Plaintiffs' current claims in this court.

<u>Mary Poole</u>

Plaintiffs additionally elicited testimony from Mary Poole who served as director of DDSN from September 2018 through February 2021. Poole had recently been terminated from this position and filed a lawsuit against DDSN alleging various claims. Her lawsuit has no relevance to Plaintiffs' claims. Moreover, Poole had no information specific to Richard's claims. Other than authoring a letter denying Richard's reconsideration request in December 2020, Plaintiffs presented no evidence of Poole's direct involvement with Richard's various requests.

---

[34] *Stogsdill v. S.C. Dep't of Health & Human Servs.*, 410 S.C. 273, 763 S.E.2d 638 (Ct. App. 2014).

<u>Robert Kerr</u>

Robert Kerr previously served as the Director of DHHS and resigned in 2007. After that, he contracted with DDSN to provide consulting services. At the time of trial, he had again been serving as director of DHHS for two months.  Although the Court expressed doubts as to the relevancy of any testimony provided by Kerr, Plaintiffs' counsel was allowed to question him on matters she felt necessary subject only to the Court's greater time limit on the presentation of evidence. As suspected, Kerr had no knowledge specific to Richard or his claims. His testimony did not aid in making any determinations contained in this order.

<u>Beverly Buscemi</u>

Beverly Buscemi previously worked for DDSN from 2009–2017. She testified generally about the request process but had no information specific to Richard's requests.

<u>Band Payments</u>

Throughout this litigation, Plaintiffs have taken issue with the funding system utilized by DDSN. Specifically, Plaintiffs allege that the use of a so-called "band funding system" caused delays in funding for services and equipment or was otherwise illegal. Testimony at trial showed that the band payment system utilized by local boards in relation to wavier participants such as Richard was disbanded as of January 1, 2021.

Plaintiffs' counsel avers that this is incorrect and local boards, such as Kershaw, continue to utilize the band funding system for wavier participants. However, Plaintiffs conflate band funding and board billing. It is undisputed that local boards may still issue payments when providers do not direct bill Medicaid. However, the funding used to make

this "board-billed" payment no longer comes from a certain pre-issued funding band. Instead, the local board issues payment and then directly bills the DDSN wavier program to recover that cost. The DDSN wavier program then bills DHHS for that cost. Thus, to the extent that any of Plaintiffs' claims rest on the use of a band funding system, those claims are now moot.

## III.    CONCLUSIONS OF LAW

Those claims remaining before the Court include a claim pursuant to § 504 of the Rehabilitation Act based upon allegations that SCDHHS has failed to make funds available, failed to make reasonable modifications to the waiver programs, failed to provide services in the least restrictive setting, and failed to utilize criteria and methods of administration—all of which created an unnecessary risk of institutionalization and segregation prohibited by § 504.

Additionally, Plaintiffs' § 1983 claim seeks to remedy violations of certain provisions of the Medicaid Act including: claims related to the fair hearing system (42 U.S.C. § 1396a(a)(3)), reasonable promptness (42 U.S.C. § 1396a(a)(8)), amount, duration and scope (42 U.S.C. § 1396a(a)(10)), reasonable standards (42 U.S.C. § 1396a(a)(17)), and feasible alternatives (42 U.S.C. § 1396n(c)(2)).

Plaintiffs are not requesting any monetary damages or compensation for past injuries or violations. Instead, they seek only declaratory and prospective injunctive relief.

Medicaid

Medicaid is an optional, federal-state program through which the federal government provides financial assistance to states for the medical care of needy

34

individuals. *Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 502 (1990). Once a state elects to participate in the program, it must comply with all federal Medicaid laws and regulations. *Id.* "Spanning hundreds of regulations across fourteen parts and scores of subparts in the Code of Federal Regulations, Medicaid is—to put it mildly—a complicated program to administer." *K.C. ex rel. Afr. H. v. Shipman*, 716 F.3d 107, 119 (4th Cir. 2013).

To aid in the complicated administration, regulations call for the designation of a single state agency to administer or supervise administration of a state's Medicaid program. 42 U.S.C. § 1396a(a)(5). SCDHHS is the single state agency responsible for administering and supervising Medicaid programs in South Carolina. DDSN has specific authority over the state's treatment and training programs for people with intellectual disabilities and related disabilities. The Wavier Administration Division is a subdivision of DDSN created to review annual plans of care and other requests of wavier participants. Case managers work for local disabilities and special needs boards or other independent providers and are contracted by DDSN for the provision of services to Medicaid recipients. *Kobe v. Haley*, 666 F. App'x 281, 284 (4th Cir. 2016).

Despite the subdivision of responsibility between these various agencies, DHHS remains the agency accountable for administrative oversight and adherence with federal law. DHHS "may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." 42 C.F.R. § 431.10(e); *Kobe v. Haley*, 666 F. App'x 281, 299 (4th Cir. 2016). In other words, DHHS may not contract away its obligations or accountability. *K.C. ex rel. Afr. H. v. Shipman*, 716 F.3d 107, 112 (4th Cir. 2013)("[T]he vesting of responsibility over a

35

state's Medicaid program in a single agency safeguards against the possibility that a state might seek to evade federal Medicaid requirements by passing the buck to other agencies.").

Reasonable Promptness: 42 U.S.C. § 1396a(a)(8)

All of the statutory and regulatory provisions identified by Plaintiffs above present overlapping claims which essentially take aim at the complicated process Richard has been forced to endure upon each request for a change in service hours or for a specific piece of medical equipment.

Central to these claims is Plaintiffs' contention that DHHS must provide services with "reasonable promptness." 42 U.S.C. § 1396a(a)(8). They further contend that the Fourth Circuit Court of Appeals has defined reasonable promptness as a period not to exceed 90 days. At the very least, Plaintiffs contend that a detailed status report should be sent explaining any delay over 90 days. Moreover, Plaintiffs contend that the 90-day clock should start the day Richard's annual assessment, or any subsequent change order, is approved by the WAD and end when Richard physically receives the equipment.

Although the Fourth Circuit has referenced certain Medicaid regulations that have a 90-day deadline, it is unclear which provisions are controlling here. In first holding that a plaintiff may enforce the reasonable promptness provision found in § 1396a(a)(8) pursuant to § 1983, the Fourth Circuit held that:

> the provision is not so "vague and amorphous" that the judiciary cannot competently enforce it: the provision is clear that the standard for informing applicants of their eligibility for Medicaid services is "reasonable promptness" and the relevant federal and state regulations and manuals define reasonable promptness as forty-five days or ninety days, depending

on the applicant. *See, e.g.,* 42 C.F.R. § 435.911[35]; South Carolina Medicaid Manual, cited at J.A. 242; United States Department of Health & Human Services Center for Medicaid and State Operations, Olmstead Update No: 4, at J.A. 290. Third, the provision uses mandatory rather than precatory terms: it states that plans "must" provide for assistance that "shall" be delivered with reasonable promptness. *See* § 1396a(a)(8).

*Doe v. Kidd*, 501 F.3d 348, 356 (4th Cir. 2007) ("*Doe I*").

However, in a subsequent Opinion within that same case, the Fourth Circuit also stated:

> Defendants argue that *Doe I* misapplied 42 C.F.R. § 435.911, which appears to establish a timeline whereby a state agency must make a determination as to eligibility, but not a timeline for when an agency must actually furnish services. (Appellees' Br. at 39–40.) They would have us instead rely upon § 435.930, which states only that Medicaid services are to be made available "without any delay caused by the agency's administrative procedures." *See, e.g., Doe 1–13 By and Through Doe, Sr. 1–13 v. Chiles,* 136 F.3d 709, 721–22 (11th Cir.1998) (upholding a district court's conclusion that "reasonable promptness" means a period not to exceed ninety days). Because we find that Defendants have never provided Doe with the appropriate services, we will not address these more subtle issues of timeliness.

*Doe v. Kidd*, 419 F. App'x 411, 416 n.2 (4th Cir. 2011)("*Doe II*").

Thus, the Fourth Circuit has not specifically defined "reasonable promptness" as applied to the provision of equipment or services to an individual previously qualified to receive Medicare or Medicaid assistance. An extensive search of other judicial circuits reveals a similar dearth of authority in comparable situations where regulations fail to identify a specific number of days in which to act. *See Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush,* 261 F.3d 1037, 1062 n.20 (11th Cir. 2001)("The only regulation that specifically

---

[35] Although this Opinion references 42 C.F.R. § 435.911, the 90 and 45-day provisions are contained in 42 C.F.R. § 435.912.

addresses the time period for furnishing services, as opposed to determining eligibility therefor, provides only that the state agency must '[f]urnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures.' 42 C.F.R. § 435.930."); *Susan J. v. Riley*, 254 F.R.D. 439, 452, n.10 (M.D. Ala. 2008) ("With respect to furnishing services, the Medicaid regulations do not define 'reasonable promptness' in terms of a specific time period. The regulations only state that the agency must furnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures.")(internal citations and quotations omitted).

While other courts have had little difficulty in determining that delays of several years violate the reasonable promptness mandate, no court has found it necessary to transcribe a bright line rule for defining reasonable promptness in regard to the provision of services or equipment to individuals previously found eligible for Medicaid. *See Doe 1-13 By & Through Doe, Sr. 1-13 v. Chiles*, 136 F.3d 709, 717 (11th Cir. 1998)("While there may be a range of reasonable time periods for provision of assistance, there certainly are *some* time periods outside that range that no State could ever find to be reasonable under the Medicaid Act.")(cleaned up); *Boulet v. Cellucci*, 107 F. Supp. 2d 61, 72 (D. Mass. 2000)("Certain periods of time, like the three to ten or more years plaintiffs have been waiting, are far outside of the realm of reasonableness—a conclusion which a court is perfectly capable of reaching.")(internal quotation omitted).

As was the case in *Doe II*, Plaintiffs here contend that DHHS has a firm 90-day window to provide or fully deny services or equipment once requested.[36] Conversely, Defendant argues this rigid deadline belies the term "reasonable promptness" and should not be used as the standard for providing services. Defendant would instead have us apply a more lenient standard such as the general rule stated in 42 C.F.R. § 435.930 that directs services should be provided "without any delay caused by the agency's administrative procedures."

Because the Fourth Circuit has expressly declined to determine which regulation is applicable to the provision of equipment or services or otherwise address the "more subtle issues of timeliness," the Court must do so here in the first instance.[37]

Accordingly, this Court holds that DHHS should strive to provide equipment and services, or an adequate formal denial thereof, in 90 days. Any provision of equipment, services, or adequate notification of denial[38] within 90 days will be presumed to be reasonably prompt and therefore comply with § 1396a(a)(8)'s reasonable promptness mandate. However, any failure to provide services or equipment within 90 days will not violate the reasonable promptness mandate if DHHS can show that any such delay was not

---

[36] Although Plaintiffs advocate for a firm 90-day period, they do concede that certain "reasonable" delays may be taken into account. However, they aver that any delay over 90 days should be explained in a formal written notice.

[37] Additionally, as stated above, ALJ's and state hearing officers have expressly declined to consider these broader constitutional issues such as reasonable promptness.

[38] This denial references a written denial complying with 42 C.F.R. § 431.210 which provides a recipient with notice of the right to appeal to the fair hearing division. The timeliness of such an appeal is provided for elsewhere in the state's Medicaid manual. *See* 42 C.F.R. § 431.244(f); State Medicaid Manual § 2903.3.

caused by the agency's administrative procedures[39] or is otherwise excusable. Each request must be examined on a case-by-case, fact specific basis to determine whether DHHS acted with reasonable promptness.

This 90-day reasonableness period is supported by the general use of 90-day periods elsewhere in Medicaid regulations. *See* 42 C.F.R. § 435.912 (determination of eligibility within 90 days); 42 C.F.R. § 431.221(allowing applicants "a reasonable time, not to exceed 90 days" to request a hearing); 42 C.F.R. § 431.244 (hearing decisions must be provided ordinarily within 90 days); *see also Boulet v. Cellucci*, 107 F. Supp. 2d 61, 73 (D. Mass. 2000)("Another regulation provides that a state's time standards for determining applicants' eligibility may not exceed ninety days for applicants who apply to Medicaid on the basis of disability. 42 C.F.R. § 435.911. While this regulation is focused on eligibility determinations rather than the actual provision of services, it still gives some guidance to courts attempting to decide what time periods may be considered reasonably prompt in the larger context.").

Additionally, the Fourth Circuit has generally cited to these 90-day provisions when discussing reasonable promptness. *See Doe I*, at 356 ("the relevant federal and state regulations and manuals define reasonable promptness as forty-five days or ninety days, depending on the applicant"); *see also Doe 1-13 By & Through Doe, Sr. 1-13 v. Chiles*, 136 F.3d 709, 717 (11th Cir. 1998)(upholding a 90-day deadline for the state agency to

---

[39] For instance, delays caused solely by the provider such as a delay in submitting a request for payment once all information is received or a delay caused by a provider's need to procure the equipment requested once approved by Medicaid may not be attributed to DHHS and included in the presumptive 90-day calculation.

determine eligibility for Medicaid recipients' requests to be placed into certain care facilities.); *Susan J. v. Riley*, 254 F.R.D. 439, 452, n.10 (M.D. Ala. 2008)("Courts considering the issue have found that 'reasonable promptness' means within ninety days.")

However, strict compliance with this 90-day goal would render the term "reasonable promptness" meaningless. If the drafters of these regulations intended for each request to be fulfilled within 90 days, they simply could have stated as such, just as they did elsewhere within the various regulations discussed above. However, these regulations are silent as to a specific number of days when providing equipment or services. Moreover, the regulations state that the agency must "furnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures." 42 C.F.R. § 435.930. The application of a strict 90-day window would render this regulation superfluous as well. Accordingly, the Court finds that the presumptive 90-day guideline expounded above to achieve the goals of providing benefits promptly, while giving credence to the language of the relevant regulations.

Although the above mandate provides a helpful first step in determining reasonable promptness, the full calculus used to determine the applicable timeline is still uncertain. Specifically, that date on which the clock starts is subject to great debate. Plaintiffs here advocate that the time for reasonable promptness should begin the day a plan of care, or subsequent change order, is approved by the WAD. Under this position, any item of medical equipment or request for a change in services listed as a need in the care plan would be due 90 days from the date the plan of care is approved.

The Court finds this suggestion untenable for several reasons. Such a proposition would work an unreasonable hardship on DHHS and its agencies—especially case managers. For instance, case managers testified that care plans would often include needs such as routine maintenance of wheelchairs or lifts to allow for faster service if a problem arose in the future. To mandate such a service be provided in 90 days would cause a case manager to order equipment prematurely or have them leave the anticipated needs off the plan altogether for fear of violating reasonable promptness.

Additionally, new "needs" as identified by caregivers are not certain to later be identified as "medically necessary" by a medical professional. This certification of medical necessity is a prerequisite to Medicaid funding. Case managers may be able to communicate with medical professionals if a recipient executes proper waivers. However, case managers have no authority to order medical professionals provide requisite documentation on a timely basis. Medical professionals may also need to perform additional evaluations, either on the recipients or existing pieces of equipment, before declaring a new piece of equipment medically necessary and drafting a proper LoN. Counting the time needed to consult with a medical professional and obtain necessary documentation against DHHS would be unreasonable given that a case manager has no control over this portion of the process.

Moreover, recipients have the freedom of choice and must therefore make their own decision as to who their preferred equipment provider will be. Accordingly, a required quote for the requested item cannot be generated until the provider is identified. Thus, even after the WAD approves a care plan, the recipient must still be the individual who identifies

a provider and relays that information to the case manager. It would be unreasonable to start the clock immediately upon WAD approval when the recipient still has the right and duty to identify his chosen provider and relay that to the case manager.[40] Moreover, such providers often need to conduct in-home inspections or gather measurements prior to providing the requisite quotes. Again, the case manager can oversee this process but ultimately has no authority to force a recipient or provider into action.

Plaintiffs aver that case managers are the individuals responsible for gathering all necessary information or prompting the recipient to provide necessary information. Specifically, Plaintiffs aver that DDSN becomes aware of needs in the care plan the moment it is approved by the WAD. Plaintiffs would then have the burden for further action shifted to the case managers and make them responsible for gathering provider information and evidence of medical necessity. However, as stated above, the case managers have no authority to force recipients, providers, or medical professionals into action.

Additionally, Plaintiffs' proposition would have the Court treat Nancy and her attorney as individuals wholly ignorant of the system and the need to acquire provider quotes and evidence of medical necessity. Nancy has years of experience requesting equipment for Richard and testified that case managers were always available to help in the process. Moreover, Nancy's attorney, Harrison, was copied on nearly every communication with case managers. Furthermore, she was present during annual assessments and even corresponded with case managers directly to suggest changes to

---

[40] This determination does not change the fact that case managers may be asked to supply a list of providers in an effort to expedite the process.

annual assessments prior to submission to the WAD. This is the same attorney who has filed dozens of state lawsuits, federal actions, administrative appeals, and the like on behalf of Medicaid recipients. Accordingly, Plaintiffs' argument that Nancy was constantly in the dark as to what was required when requesting equipment or services lacks merit. Therefore, the Court rejects the proposition that Plaintiffs need only identify a piece of equipment as a need on the annual care plan to trigger a 90-day deadline and shift the entire burden of production to the case manager.

Thus, requiring any and all requests listed in an annual plan of care or subsequent change order to be completed within 90 days of the plan's approval is not reasonable.

Conversely, DHHS argues that the time should begin only after the recipient or his caregiver has "made an application" for equipment or services. Essentially, DHHS suggests that the time begins to run only after a recipient has provided to the case manager all information and documentation necessary for acquiring funding approval of the device or service and the case manager then submits the packet for approval to Medicaid via Kepro. DHHS grounds this conclusion on the use of "date of application" as the triggering date in 42 C.F.R. § 435.912(c)(1).[41]

DHHS would have this "application" include documentation such as the name of the chosen provider, a quote from that provider, a prescription for the equipment, a letter of medical necessity, or an explanation of remedial benefit from a medical professional.

---

[41] Again, this provision appears to apply only to a potential recipient's initial application for eligibility of Medicaid benefits. However, Defendant advocates for the same rationale to apply here given the lack of specific guidance for individual requests for equipment.

DHHS further argues that it has no control over primary insurers, including Medicare, and therefore it should not be accountable for the time required to submit requests through Medicare. Thus, DHHS argues that an application for equipment is not made until Medicare is exhausted and proper documentation is submitted to Medicaid through Kepro. The Court finds this suggested start date too onerous as it could potentially place the entire burden on a recipient or his already taxed caregiver while allowing a case manager to sit idly by in contradiction to their intended purpose. These case managers are employed for their ability to aid in the process and should be engaged when a recipient identifies a need.

When contemplating the competing interests described above, the Court is left to balance the equities at play while attempting to square its determination with the Medicaid mandate of "reasonable promptness." Given the above, the Court concludes that the time begins when the case manager has either (1) been provided with all of the necessary information and documentation requested from the recipient or caregiver, or (2) at the time the recipient or caregiver has unequivocally requested assistance in obtaining the necessary information and provided the case manager with the ability to gather that information. To clarify, the recipient or care giver must either (1) provide all documentation necessary to submit the request for payment—which would include a quote from the chosen provider and a LoN—or (2) request assistance from the case manager while also clearing the path for that case manager to move forward by: properly identifying the preferred provider; executing releases sufficient for a case manager to gather the needed documentation from medical professionals; appearing for evaluation before a medical professional or provider;

or otherwise allowing a case manager to obtain the information and documentation necessary to submit a request.[42]

Of course, any delay caused by the caregiver's request to the case manager to obtain the necessary information and documentation should be taken into account when determining whether the ultimate provision of equipment or services was completed with reasonable promptness.

Moreover, the date the clock should stop is also unsettled. Plaintiffs here aver that the time stops when the equipment or service is ultimately provided[43] to the recipient. However, DHHS argues that the time should stop when payment for the device or service is authorized. DHHS avers that it cannot provide equipment or services itself. S.C. Code § 44-6-30(3). Equipment and services may only then be provided by third parties over which DHHS has no control—other than financial incentive. Thus, DHHS should not be held accountable for delays or other problems caused solely by these third-party providers. For instance, if payment for a personalized device was authorized for a provider located across the country, the time it takes to manufacture and ship the device after the payment has been authorized should not count against DHHS. Likewise, a delay in repairing a mechanical

---

[42] A combination of these two options would also be possible. For instance, a recipient's care giver could acquire and turn over a LoN from the recipient's physician while simultaneously informing the case manager of their preferred provider. Assuming no other information or evaluation was necessary, the case a manager could then contact the provider to obtain a quote which would then allow for a request to be submitted. Plaintiffs here often utilized this hybrid approach to expedite a request, and the Court anticipates such cohesion would continue to aid in the process.

[43] If the equipment is ultimately denied, the clock would then stop upon receiving a formal written notice explaining all reasons and criteria for denial.

lift necessitated by a repair company's busy schedule or unavailable parts should not count against DHHS.

This Court agrees with Defendant's position. As a source of funding for eligible beneficiaries, DHHS cannot be held accountable for delays outside of its control. Assuming it will not cause unreasonable delays, DHHS can exert what little leverage it has by authorizing payment for a device or service, yet withhold payment until delivery is actually made. Other than that, DHHS lacks the ability to expedite or otherwise force an independent manufacturer or provider to work faster.[44] Thus, this Court concludes that DHHS has fulfilled its obligation once it has authorized payment sufficient to permit the provider to finalize provision of the equipment. Should the provider require payment prior to providing the previously approved equipment or repair service, the time stops when DHHS issues the necessary payment. This authorization of funding will not otherwise relieve a case manager from their continuing obligations to a recipient, which may include monitoring the progress of the requested equipment or service once payment is authorized and keeping the recipient reasonably informed of the same.

Having determined the appropriate start date, end date, and presumptive reasonableness period, the Court may now apply this "reasonable promptness calculus" to Richard's requests for specific pieces of equipment.

---

[44] Of course, it may be possible to authorize funding for expedited manufacturing or shipping should the need arise, but that is a consideration not before this court.

Water Walker

Richard's request for a water walker provides a prime example of the arduous journey some recipients must embark upon when requesting a relatively inexpensive piece of medical equipment. Because this endeavor also includes delays attributable to both Plaintiffs and Defendant, it serves as a worthy candidate for this Court's initial use of the reasonable promptness calculus.

Although the water walker was identified as a need in Richard's October 5, 2020 care plan, the evidence showed that the case manager did not receive all necessary documents until March 25, 2021. Because Nancy was informed of the need to gather this information and was working to obtain it, the reasonable promptness window began to run only when the information was provided to the case manager. Therefore, the delays in acquiring the LoN necessitated by Richard's emergency medical conditions and Covid-19 are not attributable to DHHS. Here, the case manager already possessed the requisite quote when Nancy had Richard's physician fax the LoN on March 25, 2021. This fax was then immediately misplaced. After realizing this error, the case manager then received the LoN after it was again faxed on April 30, 2021. The delay caused by the misplaced fax is attributable solely to the case manager and is therefore considered a delay caused by the agency's administrative procedures. Thus, the presumptive promptness period began to run on March 25, 2021—the date in which Nancy had done everything in her power to provide all necessary information to the case manager.

Once all information was received, the request for a water walker was approved in 3 days — a relatively short amount of time. However, further delays ensued due to DHHS'

need to verify the provider's business license and process the board-billed payment. Although the case manager worked diligently to resolve these payment issues, the provider would not send the water walker until payment was made. DHHS ultimately issued payment by mailing a check on July 7, 2021. Because prior payment had to be issued to allow for the device to be shipped, the date of this board-billed payment serves as the termination date regardless of when the water walker was actually received. Thus, it took 104 days for Defendant to fulfill its statutory duties. As stated above, the initial delay in getting the quote and LoN to the case manager is not included in this calculus as the clock had not yet begun to run. However, the subsequent delays caused by misplacing the faxed LoN (36 days) and generating a board-billed payment (65 days) must be attributed to the Defendant. Because the period exceeded 90 days and the delays were not justified, this Court declares that Defendant failed to provide a water walker to Richard with reasonable promptness.

<u>Stander</u>

As of June 27, 2018, the LoN and quotes had been provided and case managers were working with the provider to submit its funding request to Kepro. The LoN was generated on May 2, 2018 and the quote was generated on May 16, 2018. However, Plaintiffs have failed to show how or when this information was submitted to the case manager. Thus, the Court concludes the time must begin to run on the earliest date the case manager is known to have possessed the requisite information—June 27, 2018. The case manager consulted with the provider who resubmitted its request to Kepro with different coding and documentation on September 6, 2018. Kepro denied this request on September 12, 2018

49

and Richard was informed of this denial via letter dated September 21, 2018. Moreover, this denial letter included all statutorily required information and informed Plaintiffs of additional steps that could be taken if they disagreed with the decision. This proper denial letter therefore serves as the termination date. Consequently, Defendant fulfilled its statutory duties in regard to the stander in 86 days by providing an adequate denial letter. Thus, its actions are presumed to have been reasonably prompt.

Although evidence shows that Nancy and Harrison requested that the case manager submit a request for reconsideration on the basis that a stander would provide some remedial benefit, case notes clearly show that Richard's Bright Start case manager had requested and was waiting on Nancy and Harrison to provide the medical documentation needed to make such a request. Richard then transferred away from Bright Start before reconsideration was ever sought or a request could be made to the wavier. Richard ultimately received the stander by way of a consent order issued after requesting a reconsideration from DHHS and filing an appeal to the fair hearing division. However, by agreeing to provide the stander in the consent order, DHHS did not concede that the reasons utilized in initially denying the stander were incorrect or otherwise improper. Thus, the delay in Richard's ultimate receipt of the stander caused by proper appeals after a timely denial letter is not attributable to DHHS in the initial reasonable promptness calculus. Thus, Plaintiffs have failed to show that DHHS was not reasonably prompt in providing a stander.

Ceiling Lift

Richard has had several repairs to his ceiling lift in recent years and each request for repair must be handled separately. Initially, Richard's 2018 care plan states that the lift

needed a new motor, and this need was completed no later than March 22, 2019. Notes in the care plan state that at that time the "lift is in fair condition and working for now." Plaintiff failed to present any evidence as to the date Nancy sought assistance from a case manager or otherwise provided the requisite quote or documentation for this repair request.[45] Thus, Plaintiffs have failed to show that DHHS was not reasonably prompt in repairing the lift motor.

Next, Plaintiffs contend that Richard's lift required an inspection and new battery. On November 17, 2020, Nancy informed the case manager that she had requested a quote. On January 8, 2021, Nancy paid for the new battery and inspection herself. There is no evidence showing that Nancy ever notified the case manager of this out-of-pocket payment. Nancy did not request reimbursement until August 10, 2021—well after the service had been provided. Accordingly, DHHS did not fail to meet the reasonable promptness mandate given that the inspection and new battery had already been provided before the case manager was informed of the repair or a request for reimbursement had been made.

On January 13, 2021, Nancy called the case manager to inform her that repairs were needed, and she had received a bill. This bill showed the costs for the battery and inspection discussed above. Apparently, Nancy never informed the case manager that she had made payment because the case manager requested a new invoice on January 14, 2021 after

---

[45] It does not appear that Plaintiffs were ever required to obtain a LoN or other documentation of medical necessity prior to having these repairs authorized. This is likely due to the fact that these requests were simply for repairs to previously authorized equipment. Thus, provision of the requisite bill or invoice to the case manager serves as the triggering date for these requests.

confirming with the provider that the balance had not been paid. This request to repair was approved on January 15, 2021.

The third request for repair to the lift came on January 22, 2021, when the case manager contacted the provider to clarify new costs on an amended invoice. The case manager learned that the additional costs were attributable to the replacement of certain safety equipment on the lift. The WAD approved this amended request on January 26, 2021. That same day, the case manager notified the provider of this approval so they could begin the repairs and the case manager also notified Nancy and Harrison of the progress. Although the lift was not fully repaired until March 26, 2021, DHHS fulfilled its statutory duty of reasonable promptness on January 26, 2021, when the repairs were approved and the provider notified.[46] Thus, the evidence presented by Plaintiffs show that the case manager first received the necessary quote on January 13, 2021, with an amended quote arriving on January 22, 2021. Therefore, DHHS fulfilled its duty of approving the repair requests within 13 days. Even if the Court were to use the actual repair date as the end date, the lift was fully repaired by March 26, 2021— 72 days after receiving the initial bill from Nancy. Because this period falls within the presumptive 90-day window, DHHS is declared to have acted with reasonable promptness as to the various repairs on Richard's lift.

Although Plaintiffs further contend that bills for these repairs were sent to Kershaw and remain unpaid, there is no dispute that the repairs have already been made. Accordingly, any delay in payment from Kershaw, either to the provider or to Nancy's

---

[46] Notes show that delays after this date were attributable to the provider as they had to order parts and wait for them to be shipped prior to performing the repair work.

untimely request for reimbursement, are irrelevant given that the repairs were performed with reasonable promptness.

<u>Gait Trainer</u>

The need for a new gait trainer was identified in Richard's October 5, 2020 care plan. Although Richard's October 8, 2019 care plan[47] also identifies the need for a gait trainer, there is no evidence Plaintiffs attempted to pursue a request for a gait trainer until November 17, 2020, when Nancy reached out to her chosen provider for quotes on a new gait trainer. The case manager informed Nancy on the same day that medical justification would also be needed. The case manager received this medical justification on December 4, 2020 and the quote on December 14, 2020. Thus, the reasonableness period for the gait trainer began to run on December 14, 2020. The provider confirmed that Kepro approved payment of the gait trainer no later than January 13, 2021. The gait trainer was delivered on February 16, 2021. Thus, the reasonableness period began on December 14, 2020 and ended when payment was approved on January 13, 2021, resulting in a time of 30 days. Thus, DHHS was reasonably prompt in approving Richard's request for a gait trainer.

<u>Ankle Foot Orthoses</u>

Although AFOs were not listed in Richard's October 2018 care plan, Nancy discussed the need for new AFOs with the case manager in March 2019. That Bright Start case manager sent a list of providers to Nancy on March 27, 2019. Plaintiffs presented no

---

[47] Although Richard's January 16, 2012 care plan identifies the need for a gait trainer, his October 2018 care plan does not identify the need for a gait trainer. Evidence at trial indicated that he received a gait trainer in 2014 that needed to be replaced in 2019.

evidence that they chose a provider or otherwise pursued a request for AFOs while at Bright Start or once Richard transferred to Oconee. After AFOs were again noted in Richard's October 5, 2020 care plan, the case manager received medical justification and the provider's information on December 4, 2020. However, Nancy was attempting to get a quote and had not received one as of January 22, 2021. There is no indication of when a quote was ever received. The AFOs were ultimately received on March 24, 2021. There is no indication of when payment for the AFOs was authorized, but the case manager did confirm with the provider on March 24, 2021, that payment for the AFOs would be covered by Medicaid. Moreover, on March 24, 2021, Nancy informed the case manager that there had been a delay in getting Richard's AFOs due to Richard's recent health concerns. Although there is no evidence as to when Plaintiffs received the necessary quote, if this Court were to assume that the quote was received on January 22, 2021 (the same day Nancy stated she had yet to receive a quote), the reasonableness period would run from January 22, 2021 to March 24, 2021, at the latest, for a period of 61 days.[48] Thus, Defendant provided AFOs with reasonable promptness.

---

[48] Even if this Court were to begin the reasonableness period on December 4, 2020 (the day the case manager received medical justification and provider information) and end it on the day Richard received his AFOs, only 110 days had elapsed. A portion of this delay was caused by Richard's health concerns. Because Plaintiffs have the burden of proof and failed to show how much of the delay was attributable to DHHS' administrative procedures, Plaintiffs have failed to carry its burden of showing that the excess 20 days are attributable solely to DHHS. Thus, Plaintiffs' claims would fail regardless of the triggering date used.

<u>Door Opener</u>

Nancy first requested help with repairing Richard's existing door opener on March 21, 2019 from the Bright Start case manager. Although the case manager initially reported that Nancy's chosen provider, NSM, did not provide door openers, Nancy later learned that they could provide the necessary service from their Charlotte office. The Bright Start case manager made arrangements for an NSM agent to inspect Richard's door opener and provide a quote, but Richard transferred away from Bright Start before the inspection. Plaintiffs provided no evidence of efforts made to repair the door opener while at Oconee. The door opener was noted as a need on Richard's October 5, 2020 care plan and Nancy informed the case manager on November 17, 2020 that she had requested a quote from the provider. The provider needed to inspect the door opener prior to providing a quote which was then submitted to the case manager on January 7, 2021.[49] The case manager submitted a change request and had the request approved on the same day. The case manager then notified the provider that the repairs could be made. The door opener was installed January 29, 2021. This request was approved the same day the quote was received and was therefore reasonably prompt.[50]

---

[49] It does not appear that Plaintiffs were ever required to obtain a LoN or other documentation of medical necessity prior to having this replacement authorized. This is likely due to the fact that these requests were for a replacement of a previously authorized device. Thus, provision of the requisite quote to the case manager serves as the triggering date for these requests.

[50] Even if the Court were to calculate the time period from the earliest date the case manager knew Nancy had requested a quote to the day it was repaired, only 73 days had elapsed.

Catheter Supplies

Although Plaintiffs argued that Richard is in danger of losing funding for certain tubing needed for his catheters, evidence showed that Richard has never gone without his necessary tubing and further temporary funding would be approved through the wavier until the Medicaid/Medicare funding issue was resolved. Thus, Plaintiffs have failed to show any improper action or inaction regarding the catheters. Moreover, Plaintiffs' proposed findings of fact is completely silent as to catheters. Thus, Plaintiffs have failed to support any claim arising from funding for catheter supplies.

Wheelchair

Richard's most recent wheelchair was funded through Medicare and delivered on December 11, 2019. As of March 22, 2019, Richard had been fitted for a new wheelchair. Notes dated May 2, 2019 indicate that Medicare approved funding for the wheelchair, but not a seat height adjustment accessory. The case manager then submitted a request for funding of the accessory via the ID/RD wavier which was approved on May 6, 2019—just 4 days after waiver funding was requested. Plaintiffs presented no evidence as to the cause of delay between the May 2019 approvals and the December 11, 2019 delivery. Additionally, there is no evidence of when or if quotes or medical documentation were provided to the case manager. Thus, Plaintiffs have failed to present evidence showing DHHS was not reasonably prompt in the provision of Richard's wheelchair or accessories. Even if this Court were to assume that the case manager had all necessary information by March 22, 2019 (the date Richard had been fitted for a new wheelchair), and utilized this date as the triggering date, funding for both the wheelchair and accessory were fully

approved by May 6, 2019—just 45 days later. Accordingly, approval for the wheelchair and accessory was provided with reasonable promptness.

The above determinations adjudicate Plaintiffs' claims asserting violations of the reasonable promptness mandate of 42 U.S.C. § 1396a(a)(8). Although reasonable promptness served as the gravamen of Plaintiffs' case, the Court's inquiry does not end there given the plethora of other statutory provisions Plaintiffs seek to enforce by way of a § 1983 claim.

Fair Hearing: 42 U.S.C. § 1396a(a)(3)

Plaintiffs also assert that DHHS violated 42 U.S.C. § 1396a(a)(3) which states that the state agency responsible for Medicaid state plan must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." Plaintiffs failed to present evidence that they were ever denied a fair hearing. To the contrary, DHHS provided Plaintiffs with a notice of their right to a fair hearing in the one instance where a piece of equipment was denied. When noting that a request for a stander was denied, DHHS' letter stated that: "If the service is denied again you will have the option to contact the SCDHHS Division of Appeals and Hearings and request a State Fair Hearing to appeal the decision. The denial notice that you receive after the reconsideration will explain the process to request a State Fair Hearing." Indeed, Plaintiffs later requested a reconsideration and promptly proceeded to appeal to the fair hearing division once the reconsideration request was denied. That appeal resulted in a consent

order providing the stander. Thus, a fair hearing was provided in accordance with the statute. Consequently, Plaintiffs' claims arising out of this statutory provision must fail.

<u>Amount Duration and Scope: 42 U.S.C. § 1396a(a)(10)</u>

Next, Plaintiffs assert that Defendant violated the amount duration and scope requirement found in 42 U.S.C. § 1396a(a)(10). This provision mandates that medical assistance to qualified individuals shall not be less in amount, duration, or scope than the medical assistance made available to other individuals. Plaintiffs made no reference or argument to this statutory provision during trial and therefore have failed to meet their burden in showing such a provision was violated. Therefore, any claims arising out of this provision likewise fail. As an aside, it appears that this provision would be applicable only to Plaintiffs' request for nursing hours, which has been found to be moot, and not to Plaintiffs' request for medical equipment.

<u>Reasonable Standards: 42 U.S.C. § 1396a(a)(17)</u>

Next, Plaintiffs assert that Defendant violated 42 U.S.C. § 1396a(a)(17) which mandates that the state entity must promulgate reasonable standards for determining eligibility for and the extent of medical assistance under Medicaid which are consistent with the objectives of the Medicaid program. However, the Court agrees with Defendant's proposition that there is no private cause of action under § 1983 for a violation of 42 U.S.C. § 1396a(a)(17). *Davis v. Shah*, 821 F.3d 231, 244 (2d Cir. 2016) ("Because the Medicaid Act's reasonable standards provision addresses a state's general administrative duties under the Act, rather than defining individual beneficiaries' entitlements under that program, it does not appear to contain the type of rights-creating language necessary to

confer a private cause of action."); *Hobbs ex rel. Hobbs v. Zenderman*, 579 F.3d 1171,

1182 (10th Cir. 2009); *Lankford v. Sherman*, 451 F.3d 496, 509 (8th Cir. 2006); *Watson v.*

*Weeks*, 436 F.3d 1152, 1162 (9th Cir. 2006).

Even if Plaintiffs possessed a private cause of action to enforce 42 U.S.C. §

1396a(a)(17), Plaintiffs have still failed to show how a failure to promulgate reasonable

standards resulted in any injury here. As stated above, Plaintiffs had unfettered access to

their case managers who provided information and guidance throughout their various

requests. Moreover, these case managers testified that they had access to DHHS and DDSN

agents and decision makers should the need for additional information or clarification arise.

Plaintiffs failed to show how additional written reasonable standards would have advanced

their cause or otherwise aided in their requests. Although Plaintiffs did argue that access to

the computer program Therap would allow them to closer monitor requests, they failed to

show how the same information could not be garnered by simply calling their case

manager. Accordingly, Plaintiffs presented no evidence that the lack of access to this

program resulted in an injury to Richard or a future injury needed for declaratory and

injunctive relief. *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018)([B]ecause plaintiffs

here seek declaratory and injunctive relief, they must establish an ongoing or future injury

in fact".) Thus, Plaintiffs' claims arising out of 42 U.S.C. § 1396a(a)(17) must fail.

Feasible Alternatives: 42 U.S.C. § 1396n(c)(2)

Next, Plaintiffs' complaint asserted violations of 42 U.S.C. § 1396n(c)(2) which

mandates that the state assures that "such individuals who are determined to be likely to

require the level of care provided in a hospital, nursing facility, or intermediate care facility

59

for the [intellectually disabled] are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the [intellectually disabled]." On its face, this provision applies only to Plaintiffs' now mooted claims regarding nursing hours and not the provision of medical equipment. Thus, any claims based on this statutory provision must fail. Again, even if this section were applicable to medical equipment, Plaintiffs have failed to show what reasonable alternatives may have existed or that Richard was entitled to be informed of them.

The Rehabilitation Act

The Court now turns to Plaintiff's remaining claims of violations of § 504 of the Rehabilitation Act. Within their proposed conclusions of law, Plaintiffs summarily state that:

> Plaintiff Stogsdill is entitled to relief under § 504 of the Rehabilitation Act because he has shown (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; (4) the program receives federal financial assistance, and he has requested reasonable modifications to the DHHS/DDSN programs so that (1) DHHS should be directed to require DDSN to provide Stogsdill access to Therap, DHHS should be required to provide written notices compliant with 42 C.F.R. 431.210 when needed services are denied, reduced, suspended or not provided within 90 days.

Plaintiffs provide no other support for this argument. Despite Plaintiffs' assertions, they have failed to present any evidence that Richard was denied benefits of the program solely by reason of his disability. As stated above, DHHS' only failure to comply with reasonable promptness was in regard to the water walker. Moreover, those delays, although

60

attributable to DHHS, were caused by a misplaced fax and failure to timely issue a check to an out-of-state provider. At no point did Plaintiffs present any evidence or argument that Richard was discriminated against because of his disability. At no point did Plaintiffs argue that Richard's risk of institutionalization increased because of a failure to provide the requested equipment. Accordingly, Plaintiffs have failed to show a violation of § 504.

Although Plaintiffs again request that this Court mandate they have access to Therap, Plaintiffs have failed to show how this access would aid in the process or otherwise provide information readily available via their case managers. Additionally, Plaintiffs have failed to show why DHHS should be ordered to provide written notices compliant with 42 C.F.R. 431.210 when needed services are not provided within 90 days. As evidenced above, the only denial DHHS issued complied with 42 C.F.R. 431.210.[51] Moreover, applicable regulations only mandate such a written notice in certain situations including the denial, termination, or reduction of an individual's claim for benefits or services. 42 C.F.R. § 431.206; 42 C.F.R. 431.201. There is no indication that such a notice is likewise mandated for a failure to provide equipment within 90 days. The Court declines the invitation to read in such a mandate to otherwise silent regulations now. Again, case managers conduct status calls with Nancy at least monthly. Any delay in a request for equipment can be explained in these frequent communications.

---

[51] This regulation requires a notice to contain: a statement of what action will be taken; a statement of the reasons supporting the action; the specific regulations supporting that action; and an explanation of the recipients right to a hearing. 42 C.F.R. § 431.210.

As an aside, Plaintiffs presented evidence that a recipient may be able to request a fair hearing when a "request for benefits has not been made in a timely manner." (ECF No. 469, p. 2). Indeed, 42 C.F.R. § 431.200 mandates that a recipient be provided an opportunity for a fair hearing when "a claim for assistance is denied or *not acted upon promptly*." (emphasis added); *see also* 42 C.F.R. § 431.220(a)(1). Accordingly, Plaintiffs are free to request a fair hearing should they feel Richard's requests are not being processed in a timely manner. Of course, DHHS may avoid the risk of such a fair hearing request by complying with the 90-day presumptive reasonableness period as set forth above.[52]

Although previously barred by preclusion principles, the above determinations as to § 504 of the Rehabilitation Act would apply equally to Plaintiffs' claims under the ADA because these two provisions impose the same integration mandate. *Pashby v. Delia,* 709 F.3d 307, 321(4th Cir. 2013) ("We consider their Title II [of the ADA] and section 504 claims together because these provisions impose the same integration requirements.").

Accordingly, other than the singular declaration regarding DHHS's failure to provide the water walker with reasonable promptness, Plaintiffs have failed to carry their burden of proof in regard to all other claims. To the extent that any remaining claim is not specifically addressed above, the Court finds that those remaining claims likewise fail as Plaintiffs have failed to provide sufficient evidence which would warrant the relief sought.

---

[52] Although these fair hearing officers and administrative law judges have refused to issue a ruling on constitutional claims, they remain able to determine whether a recipient it entitled to a certain piece of equipment and whether that piece of equipment has been approved in a timely fashion.

Consequently, the Court declines to issue any prospective injunctive relief. *See Kenny v. Wilson*, 885 F.3d 280, 287-88 (4th Cir. 2018) (stating to prevail in an action for prospective injunctive relief, plaintiffs must establish an ongoing or future injury in fact) *citing O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Having elucidated the reasonable promptness calculus, the Court has clarified Defendant's obligations in providing medical equipment to qualified recipients once properly requested. Given that DHHS was, and continues to be, bound by applicable Medicaid statutes and regulations, including the reasonable promptness mandate, ordering DHHS to process Richard's future requests in a reasonably prompt manner would serve no useful purpose and be completely superfluous. Because Plaintiffs have expressly declined to seek any monetary damages, the declaratory relief described above remains their sole award in this action.

As noted by other Judges in this district, the State of South Carolina's administration of the Medicaid system is far from perfect. *Timpson by & through Timpson v. McMaster*, 437 F. Supp. 3d 469, 472 (D.S.C. 2020) ("Make no mistake about it, the disability system in South Carolina is broken and is in need of repair. Programs are underfunded. Waitlists are long. And patients are not adequately informed about the programs for which they qualify."). Defendant here admits that the system is not beyond reproach. Furthermore, the Court does not doubt the seriousness of Richard's ever-evolving needs for medical equipment, nor does it seek to downplay the potential hardships caused by administrative

red tape. However, not every delay or procedural requirement results in a violation of Richard's federal rights.

Plaintiffs here have inundated the Court with irrelevant exhibits, amorphous and shifting arguments, and scattered references to various cases, statutes, and regulations. Despite this years long saga, Plaintiffs have again failed to prove a vast majority of their claims. Moreover, the relief which was granted could have been supported with a handful of exhibits and limited testimony. Instead, Plaintiffs' counsel flooded the Court with thousands of irrelevant documents, numerous immaterial witnesses, and specious legal arguments.

Despite this protracted litigation, and through final resolution thereof, this Court seeks to have provided some clarity and guidance for all parties moving forward in hopes to avoid further unnecessary and prolonged litigation.

## IV.    CONCLUSION

For all the reasons stated above, Plaintiffs' request for declaratory relief is granted as to the reasonable promptness determination regarding the untimely provision of Richard's water walker. All other requests for relief are denied.

IT IS SO ORDERED.

October 5, 2021                                  Joseph F. Anderson, Jr.
Columbia, South Carolina                         United States District Judge